## Case No. 16,991.

### The VOLUNTEER.

[1 Sumn. 551.] [1]

Circuit Court. D. Massachusetts. May Term. 1834.

ADMIRALTY JURISDICTION — MARITIME LIENS — FREIGHT UNDER CHARTER-PARTY—GENERAL AND SPECIAL OWNERS.

1. The admiralty has jurisdiction in cases of charter-parties for foreign voyages; and may enforce, by a proceeding in rem, the maritime lien for freight under a charter-party.

[Followed in Certain Logs of Mahogany, Case No. 2,559. Cited in Arthur v. The Cassius, Id. 564; House v. The Lexington. Id. 6,-767a; Knox v. The Ninetta, Id. 7,912; The Panama, Id. 10,703; Thatcher v. McCulloh. Id. 13,862; The Zenobie. Id. 18,208; The Flash, Id. 4,857; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 420; Gloucester Ins. Co. v. Younger, Case No. 5,487; The Hendrik Hudson. Id. 6,358; The Maggie Hammond v. Morland, 9 Wall. (76 U. S.) 452. Approved in Vandewater v. The Yankee Blade, Case No. 16,-847; The Hyperion's Cargo, Id. 6,987; The Illinois, White and Cheek. Id. 7,005; The Baracoa. 44 Fed. 103; Freights of The Kate, 63 Fed. 713.]

2. The general owner is owner for the voyage, notwithstanding a charter-party, if the vessel is navigated at his expense, and by his master and crew, and he retains the possession and management of her during the voyage; and especially, where he retains a part of the vessel for his own use.

[Approved in Certain Logs of Mahogany, Case No. 2,559. Reaffirmed in The Nathaniel Hooper, Id. 10,032. Cited in Perkins v. Hill, Id. 10,987; Kimball v. The Anna Kimball, Id. 7,772. Approved in The Aberfoyle, Id. 16. Cited in Raymond v. Tyson, 17 How. (58 U. S.) 60; Hill v. The Golden Gate, Case No. 6,491; Donahoe v. Kettell, Id. 3,980; Reed v. U. S., 11 Wall. (78 U. S.) 601; Richardson v. Winsor. Case No. 11,795; Leary v. U. S., 14 Wall. 611.]

[Cited in Swift v. Tatner, 89 Ga. 660, 15 S. E. 844; Adams v. Homeyer, 45 Mo. 553; Robinson v. Chittenden, 69 N. Y. 528; Sheriffs v. Pugh, 22 Wis. 276.]

3. By the general maritime law, there is a lien on the goods for freight, whether shipped under a bill of lading, or a charter-party. But that lien may be waived or displaced by any special agreement inconsistent with such lien. But it is presumed to exist, until such inconsistency appears.

[Cited in Shaw v. Thompson, Case No. 12,726; Perkins v. Hill, Id. 10,987; Raymond v. Tyson, 17 How. (58 U. S.) 60; Sears v. 4,885 Bags of Linseed. Case No. 12,589; Harris v. The Kensington, Id. 6,122.]

[Howard v. Macondray, 7 Gray, 519; Hatch v. Tucker, 12 R. I. 505.]

4. A stipulation for the payment of the freight ten days after the return of the vessel, is not necessarily inconsistent with such lien.

[Approved in Duncan v. Kimball, 3 Wall. (70 U. S.) 44. Cited in The Bird of Paradise v. Heyneman, 5 Wall. (72 U. S.) 556.]

5. By the maritime law, the ship is pledged to the merchandise, and the merchandise to the ship, for the performance of the contract of shipping.

[Cited in Dupont v. Vance, 19 How. (60 U. S.) 169.]

6. A clause in the charter-party, that the parties bind the ship and goods respectively for the performance of the covenants, payments, and agreements thereof, is a valid clause, creating a pledge or lien on the goods for such performance; and may be enforced against the goods by a detention by the ship-owner for the freight; and by a suit in the admiralty.

[Cited in Perkins v. Hill, Case No. 10,987. Distinguished in Webb v. Anderson, Id. 17,-318. Cited in The Peer of the Realm, 19 Fed. 217.]

[Cited in The Keystone v. Moies, 28 Mo. 243.]

[Appeal from the district court of the United States for the district of Massachusetts.]

Libel in rem for freight, brought by Ezra Weston, libellant, against the proceeds of the cargo of the schooner Volunteer, for freight asserted to be due to the libellant, as owner of the vessel, and earned under a charter-party made by the libellant with Messrs. Bixby, Valentine & Co. on a voyage from Boston, (Massachusetts,) to Havana in the Island of Cuba, and back again to Boston. In the course of the voyage Messrs. Bixby. Valentine & Co. failed in business, and the proceeds of the outward cargo, then on board, were assigned to the claimants [Theophilus Parsons and others] as assignees for the creditors; and though the voyage was successfully performed, they decline the payment of the freight upon the grounds stated in their answer. The libellant, upon the arrival of the schooner at Boston, refused to deliver up the homeward freight without payment or security for payment of the freight. The parties then agreed to have the same sold, and the proceeds deposited as a substitute, subject to the same claims for freight and process as the cargo might be. The present libel was accordingly filed against the proceeds. The assignees filed a claim and answer denying the jurisdiction of the court, and the rights of the libellant to any lien for the freight; and praying a restitution of the same to them.

C. P. Curtis, for libelant.

Theophilus Parsons, for claimants.

STORY, Circuit Justice. This is the case of a libel in rem for freight earned under a charter-party, brought by the general owner of the schooner Volunteer against the homeward cargo, (the proceeds being substituted for it by consent of parties.) which the claimants assert a title to under an assignment of the charterers, who became insolvent in the course of the voyage.

Three questions have been made at the bar. First, whether the district court possesses jurisdiction, as a court of admiralty and maritime jurisdiction, over the cause. Secondly, who, upon the true interpretation of the terms of the charter-party, was the owner for the voyage. Thirdly, whether, upon the terms of the instrument, there is any lien on the homeward cargo for freight, supposing the ownership for the voyage to be in the libellant.

It is now approaching nearly to twenty years, since I had occasion to consider with laborious care and attention the nature and extent of the jurisdiction of the admiralty over maritime con-

tracts. De Lovio v. Boit [Case No. 3,776]. The conclusion, to which my mind then arrived, was, that the admiralty had an original, ancient, and rightful jurisdiction over all maritime contracts, strictly so called, (that is, such contracts as respect business, trade, and navigation to, on, and over the high seas,) which it might exert by a proceeding in rem in all cases, where the maritime law established a lien or other right in rem, and by a proceeding in personam, where no such lien or other right in rem existed. The courts of common law, it is true, had on various occasions denied, opposed, and sought to restrict this jurisdiction. But their decisions have been founded in no uniform principles or reasoning; and have been, if it may be so said without irreverence, more the offspring of narrow prejudice, illiberal jealousy, and imperfect knowledge of the subject, than of any clear and well-considered principles. These decisions have fluctuated in opposite directions at different periods; and the final results, unfavorable to the admiralty, have been in a great measure owing to a deference for the learning of Lord Coke, whose hostility to the admiralty, not to speak of his disingenuousness, entitle him to very little respect in such a discussion.[2] At all events, the contradictory nature of these decisions, and the state of the law on the subject at the time of the emigration of our ancestors, as well as the structure and jurisdiction of the vice-admiralty courts under their commissions, on that occasion seemed to me to require, that the jurisdiction of the admiralty in America should be re-examined, and established upon its true principles, and maintained upon its just original foundations. If, since that period, I had found reason in any subsequent researches to change these opinions, I should not hesitate on the present occasion to avow and correct errors; for the advancement of juridical truth is, and ever ought to be, far more important to every judge, than any narrow adhesion to his own preconceived and ill-founded judgments. But I am free to confess, that after every thing, which I have heard and seen in the intermediate period, whether in the shape of appeals to popular prejudices, or of learned and liberal arguments, or of severe and confident criticism, I have been unable to change these opinions. They remain with me unshaken and unrefuted. Whether it is fit, that the admiralty jurisdiction of the United States should be administered upon its just and original principles; or whether it should be bound down and crippled by the arbitrary limitations of the common lawyers; it is not for me to decide. I have no desire to extend its just boundaries, or, by any attempt to amplify its justice, to encourage usurpation. But, believing as I do, that it is a

---

[2] The learned reader will find this subject much discussed in Prynne's very able expositions of Lord Coke's errors, in his Animadversions on the 4th Institute, c. 22, on the admiralty court. Prynne's Animad. pp. 75–133. See also Buller, J., in Smart v. Wolff, 3 Term R. 348; 2 Browne, Civil & Adm. Law, pp. 83–85, 100.

rightful jurisdiction, highly promotive of the best interests of commerce and navigation, and founded in the same enlightened wisdom, which has sustained the equity jurisdiction through all its earlier as well as later perils, I cannot consent to be the instrument of surrendering its powers, consistently with my own conscientious discharge of duty. Other persons with different opinions may concur in reducing it to a state of decrepitude, which will leave it neither dignity nor power; and I shall not scruple to obey their decisions, when they shall have judicially prescribed the limits, which I am bound not to transcend. But, although I am prepared to vindicate the admiralty jurisdiction over all maritime contracts, as matter juris et de jure, it is not my intention to do more than to affirm it in the present case, where the suit is founded upon a claim of freight under a charter-party for a voyage on the high seas. And, in the first place, I shall show what has been the claim of the admiralty itself in relation to this matter; and in the next place, how it stands or has stood upon the authority of adjudications at the common law.

In regard to the jurisdiction asserted by the admiralty over charter-parties, it can be traced back to the very earliest records of the court. We find from the records contained in the Black Book of the Admiralty, (a work of high antiquity and undoubted authority,) that as early as the second year of the reign of Edward the First, that monarch with the assent of his lords, (ses seigneurs,) by an ordinance made at Hastings, expressly prohibited all seneschals and bailiffs of the lords of franchises on the sea-coasts from taking cognizance of any pleas touching merchant or mariner, as well by deed as by charter of ships, obligations, and other deeds beyond twenty shillings or forty shillings in amount, upon penalty of prosecution therefor in the admiralty. And it was declared by the same ordinance, that every contract made between merchant and merchant, or merchant and mariner, beyond seas or within the flood-mark, should be tried before the admiral, and not elsewhere. Clerke's Praxis, Roughton, pp. 143, 144, art. 28, cc. 20, 21; Id. p. 120, art. 17; Id. p. 130, art. 26; Prynne's Animad. pp. 111, 114–116; Id. pp. 83, 88, 90, 103, 123; De Lovio v. Boit [Case No. 3,776]. This ordinance was fully recognized and enforced by penal sanctions in the reign of Edward the Third. Id. The early commissions to the admiralty were conceived in terms so general and broad, as to include an ample jurisdiction in all maritime contracts. See Prynne's Animad. pp. 85, 118–122; De Lovio v. Boit [supra]. After the passage of the statutes of 13 Richard II. c. 5, and 15 Richard II. c. 3, whose prohibitions can by no just construction be applied to charter-parties made in foreign ports for foreign voyages, even if they can be applied (which I do not admit) to charter-parties made within the realm, for voyages on and over the high seas, or beyond seas, the commissions of the admiralty contained a proviso, that the admiralty should not

take cognizance of any contracts, pleas, or complaints, (quereles,) made or arising on land or water, within the body of any county.[3]  Mr. Prynne (a most learned antiquarian) does not hesitate to affirm, that, from the time of passing these statutes down to the time, when Lord Coke, in the beginning of the reign of King James the First, commenced his hostilities against the admiralty jurisdiction, there is not to be found a single case, with the exception of Tooley's Case [12 Mod. 312] 36 Hen. VIII., which can in no correct view be deemed a decision on the point, (Prynne's Animad. pp. 76, 83), in which, upon maritime contracts made in foreign ports, any prohibition had ever been granted (Id. pp. 76, 77, 83, 84). And yet during all this period, he insists, that suits upon foreign charter-parties, and other foreign maritime contracts, were constantly brought and decided in the admiralty. Id. pp. 83, 84; De Lovio v. Boit [supra]. The admiralty did not, indeed, limit itself to foreign maritime contracts; but insisted upon maintaining jurisdiction over charter-parties for foreign voyages, and other maritime contracts, made within the realm, upon the ground, that the statutes of Richard never intended to touch or trench upon this ancient and well-founded jurisdiction. Sir Leoline Jenkins has expounded this subject with great clearness and force in his celebrated argument before the house of lords, in favor of the admiralty jurisdiction; and he applied it especially to charter-parties made within the realm, for voyages over or beyond the seas.  1 Sir Leo. Jenkins's Works, by Wynne. p. 6; Hall. Law J. p. 557. He is supported in this opinion by Zouch, Godolphin, and Exton; and by the constant claim and exercise of the jurisdiction by the judges of the court of admiralty down to his own times.  See Zouch, Adm. pp. 98–102, 118; Godol. Adm. Jur. pp. 42. 44, 129, 132, 141; Exton, Mar. Dic. pt. 3, cc. 2–8. See, also, Id. pp. 321, 386. The language of the commissions, granted to the admiralty after these statutes were passed, proceeded upon the ground, that it was a rightful jurisdiction. Zouch has given us a transcript of the common form of these commissions, which he asserts to have been of one uniform tenor from the time of Queen Mary down to the time of Charles the Second. The language of these commissions gives authority "to hold conusance of pleas. &c., charter-parties, contractions, bills of lading, and all other contracts, which may any ways concern moneys due for freight of ships hired, or let to hire." Zouch, Adm. p. 92; De Lovio v. Boit [Case No. 3,-

776], note.  The statute of 32 Hen. VIII. c. 14, also which, for the purpose, as it avows, of aiding the navigation and commerce of the realm, makes many special provisions in regard to charter-parties for voyages from London to foreign countries, and from the latter to London, expressly gave to the court of admiralty jurisdiction to entertain suits for negligent keeping of the merchandise shipped, and delays in the voyage, against the owner and master of the ship.[4]  And yet Lord Coke, with singular disingenuousness, has wholly suppressed this clause in his statement of the statute; and has given to its provisions a false coloring, which cannot fail to mislead the reader.  4 Inst. p. 139.

In the next place, as to the doctrine of the courts of common law.  It is true, that the jurisdiction asserted by the court of admiralty over charter-parties and maritime contracts, was not, after the statutes of Richard II., admitted by the courts of common law to be well founded.  But it is equally true, that it was not uniformly denied by those courts.  On the contrary, there are to be found various cases, where the jurisdiction has been directly or indirectly affirmed.  See De Lovio v. Boit [supra]; Exton, Mar. Dic. pt. 3, p. 338, c. 7; Id. p. 352, c. 8; Id. p. 360, c. 9.  The struggle, indeed, by the admiralty to maintain its ancient jurisdiction was constantly renewed, as often as the courts of common law sought to restrain it.  This struggle was, about the middle of the reign of Queen Elizabeth, (in May, 1575,) brought to an issue by a complaint of the court of admiralty to the queen; and thereupon the judges of the king's bench, and the judge of the court of admiralty, came to an agreement on the subject, which is given at large by Prynne, and Zouch, and Lord Coke. 4 Inst. p. 134; Zouch, Adm. p. 14; Prynne's Animad. p. 98; [U. S. v. Bevans] 3 Wheat. [16 U. S.] 365, 367, note.  One of the articles of agreement is as follows: "It is agreed, that the said judge (of the admiralty) may have and enjoy knowledge and breach of charter-parties made between masters of ships and merchants, for voyages to be made to the ports beyond the seas, and to be performed beyond and upon the seas, according as it hath been accustomed, time out of mind, and according to the good meaning of the statute of 32 Hen. VIII. c. 14, though the same charter-parties happen to be made within the realm."  This agreement remained in full force and operation until Lord Coke became chief justice of the court of common pleas, in the sixth year of the reign of James the First, when he granted a prohibition in a case of this sort. The subject was then brought before the king; and we have now the answer of Lord Coke and his

---

[3] Prynne's Animad. pp. 85, 118–122.  Mr. Prynne has with great learning and ability endeavored to show from the petitions to parliament, on which the statutes of Richard the Second were grounded, that they were not intended to abridge the original jurisdiction of the admiralty; but to take away encroachments of the admiralty in regard to persons and things, which had nothing to do with maritime contracts or transactions on or beyond the seas. Prynne's Animad. pp. 77–85.

[4] The statute is given at large in the recent edition of the statutes, published by authority of the British parliament.  Prynne, in his Animadversions (pages 121, 122), has given the proviso verbatim; and I have myself examined the statute in order to ascertain its correctness. See, also, Zouch, Adm. p. 106.

brethren given in answer to the articles of agreement on that occasion, in his 4th Institute, (page 134.) And what is the answer of Lord Coke to the agreement? He does not attempt to deny the genuineness or authority of the document in direct terms. But he uses the following language: "That for so much thereof as differeth from these answers, it is against the laws and statutes of this realm; and therefore the judges of the king's bench never assented thereto, as is pretended; neither doth the phrase thereof agree with the terms of the laws of the realm." It is incredible, that this supposed agreement should have been spurious. It was recorded (or reserved, as Prynne says) in the court of admiralty, and produced before the king by the then judge of the admiralty, as a genuine paper, containing the points of jurisdiction insisted on by the admiralty on one side, and the separate answers to each by the judges of the king's bench, on the other side.

The controversy was from that time renewed with unabated vigor on each side, and continued until the reign of Charles the First, when the subject was again brought before the king in council, upon the complaint of the admiralty; and the matters in difference between the admiralty and the courts of common law were several times heard and debated at large. At length, in February, 1632, certain articles were drawn up, read, agreed to, and resolved upon, by the king and council, and signed and assented to by the twelve judges of England, and the then attorney general, and entered upon the registry of the council. Prynne's Animad. pp. 100, 101; Godol. Adm. p. 157; Exton, Mar. Dic. p. 403; Zouch, Adm. pp. 122, 123; 2 Browne, Civ. & Adm. Law, p. 78; Hall, Adm. Intro. Jur. 24, D. To these articles of agreement Lord Coke's objection cannot apply, that they were never signed or assented to by the judges. The first of these articles is in these words: "If a suit should be commenced in the admiralty upon contracts made, or other things personal done, beyond the seas, or upon the sea, no prohibition is to be awarded." The second is: "If suit be before the admiral for freight, or mariners' wages, or for breach of charter-parties, for voyages to be made beyond the seas, though the charter-party happens to be made within the realm, so as the penalty be not demanded, a prohibition is not to be granted. But if the suit be for the penalty; or if the question be whether the charter-party were made or not; or whether the plaintiff did release, or otherwise discharge the same within the realm; this is to be tried in the king's court at Westminster, and not in his court of admiralty." The restrictions here insisted on, are of matters exclusively arising on land within the realm, and in no wise facts arising on the sea, or beyond seas.

It is difficult to conceive, how any case of jurisdiction could be more firmly and deliberately settled, than on such an occasion. The very circumstance, that it contained the opinions, and had the judicial assent of the judges of the realm, as well as of the king and his council, (an uncommon number being assembled for the purpose,) gives to it as great a sanction of authority in point of law, as any, which can be imagined. If the opinions of Lord Coke and his brethren at a former period are to be held of any authority, as evidence of the law; how much more weight ought to be attributed to such a solemn re-examination of the whole subject under such circumstances? I profess myself wholly unable to comprehend any grounds, upon which the conclusiveness of such an adjudication can be gainsaid or overturned. Sir Leoline Jenkins has remarked, that this act of council was the result of many solemn debates; and not the effect of artifice and surprise; that it was enrolled in the several courts of Westminster, as the resolutions of all the judges, and as a standing rule to be observed for the future; and that it was punctually observed, as to the granting and denying of prohibitions, until the late disorderly times, (the times of the commonwealth,) bore it down, as an act of prerogative, prejudicial (as was pretended) to the common laws, and the liberty of the subject. And he then adds, that it was not long before the usurping powers found it necessary, for the encouragement of trade and navigation, to make several ordinances confirming the jurisdiction. 1 Sir Leo. Jenkins's Works, Argument on Adm. Jur., 6 Hall, Law J. p. 568.

The learned judge is well warranted in these statements. There is a case of a libel for freight reported by Prynne, in which he was counsel, and which was finally decided by the house of lords upon appeal in 1645, in which the jurisdiction of the admiralty to maintain such a suit, was expressly affirmed, and a procedendo was awarded to the court of delegates, (in which the suit was then pending,) to proceed and decide the cause; and they accordingly did decide it in favor of the libellant, and he had execution for his debt and costs accordingly. Prynne's Animad. pp. 123, 124. (Mr. Prynne has given a copy of the judgment of the house of lords.) Here, then, we have the highest judicial authority of the realm asserting the same jurisdiction, which had been asserted by the twelve judges in 1632. In Scobell's Collection of Ordinances during the Commonwealth, we also find the act or ordinance, passed by parliament during the time of the commonwealth, on the subject of the jurisdiction of the admiralty. It was first passed in 1648, and was by subsequent ordinances made perpetual. But, though it was carried into full effect during the protectorate, yet upon the restoration of Charles the Second it was treated, like all the other ordinances of parliament during the commonwealth, as an act of usurpation, and therefore it then in a legislative sense expired. The ordinance expressly declares, among other things, that the court of admiralty shall have cognizance and jurisdiction "in all cases of charter-parties, or contracts of freight, bills of lading," &c. See Hall, Adm. Jur. 24, E.

It is most material to observe, that this affirmation of the admiralty jurisdiction over charter-parties in 1632 was about the period of the emigration of our ancestors; and the jurisdiction continued to be so held until 1660. So that it may be deemed to have been brought by them to this country, as a part of the then acknowledged common law of the land. But it is still more material to state, that the prohibitions of the statutes of Richard the Second, whatever may be their true interpretation, are by their very language and objects limited to the high court of admiralty, and its proceedings within the realm of England; and they do not affect to control the ancient jurisdiction exercisable by the lord high admiral elsewhere out of the realm; and never were applicable in terms to the vice-admiralty courts in the colonies. At least, I have never been able to find any decisive traces of such limitations, acknowledged or acted upon in the vice-admiralty courts. On the contrary, in all the forms of the commissions of the vice-admiralty courts, which have fallen under my observation, there is a most ample enumeration of jurisdiction in all maritime causes. Stokes, in his History of Colonies (page 166), has given a copy of the common form of the commissions of the vice-admiralty courts; and it is precisely in the same terms with all the others, which I have seen. It grants authority "to take cognizance of, and proceed in, all civil and maritime causes, and in complaints, contracts, offences, &c., pleas, debts, &c., charter-parties, agreements, suits, trespasses, injuries, &c., and business civil and maritime," &c.[5] So that, unless we are prepared to say, that these commissions issued by the crown from time to time to the vice-admiralty courts in the American royal provinces, as well as in the colonies generally, are to be treated as clear usurpations of authority, (which would be a bold proposition to maintain,) there seems every reason to hold, that the admiralty jurisdiction in the colonies and provinces was not affected by the statutes of Richard. Dr. Browne informs us, that, as late as 1764, a suit for freight was maintained in the vice-admiralty court of Gibraltar; and that down to his own day, (in 1800,) suits on charter-parties and by material-men were often brought in Ireland without any prohibition. In a very recent case (The Elizabeth, 1 Hagg. Adm. 226), which was a libel on a charter-party, originally brought in the vice-admiralty court at the Cape of Good Hope, an appearance was given to the suit under protest to the jurisdiction. 2 Browne, Civ. & Adm. Law, p. 122, note (74); Id. pp. 534, 535, 538. The commission contained authority, (as in common patents,) to take cognizance of charter-parties; and the protest was overruled, and a decree to pay the money into court was made; and it was paid into court accordingly; and an appeal was taken to the high

court of admiralty. The appeal not being prosecuted, the appellate court pronounced the appeal to be deserted, and condemned the appellant in costs. This decree cannot be vindicated, except upon the supposition that the vice-admiralty court was, in the opinion of Lord Stowell, competent in point of jurisdiction to entertain the suit. It may be very different with the high court of admiralty in England. Under the torrent of prohibitions (Id. p. 85), which have been poured upon it in former times, it is indeed difficult to know, what construction ought to be put upon any of the terms of the admiralty commission. Lord Stowell is but too well justified in the remark made by him, in the spirit of uncomplaining, but conscious injustice, that "it is universally known, that a great part of the powers given by the terms of that commission are totally inoperative; and that its actual jurisdiction stands in need of the support of continual exertions and usage." The Apollo. 1 Hagg. Adm. 312, 313. And Dr. Browne is so little satisfied with the decisions made on the subject of the admiralty jurisdiction by the courts of common law during the reign of Charles the Second, that he does not scruple to say, "that if a party were to institute a suit in the high court of admiralty on a charter-party for freight, I do not see, how the court could refuse to entertain it; and I have some reason to think, that this my opinion is supported by very high authority." 2 Browne, Civ. & Adm. Law, p. 122. Who the high authority is, to whom he here alludes, we have no means of knowing, though it might perhaps be conjectured, that he alludes to Lord Stowell, then presiding in the high court of admiralty. However this may be, I for one cannot yield up my own judgment upon this subject, supported as it is by the clearest evidence of an ancient and well-settled original jurisdiction in the admiralty, by the assent and agreement of the twelve judges in 1632, and by the deliberate judgment of the house of lords in 1645, to later adjudications by any inferior tribunals, having nothing to commend them in the depth of the learning or reasoning, which they display, and built upon no consistency of principles. Having gone over this matter at large in De Lovio v. Boit [supra], I do not propose to re-urge the arguments there urged; and I content myself in conclusion by stating my deliberate judgment to be in favor of entertaining jurisdiction in the present case. Mr. Chancellor Kent has also expressed his decided opinion in favor of the jurisdiction (3 Kent, Comm., 2d Ed., 1832, p. 220, lect. 47); and my learned brother, Judge Ware, has supported it by great force of reasoning and depth of learning, in the case of Drinkwater v. The Spartan [Case No. 4,085].

The next question is, who is to be deemed owner for the voyage under the terms of this charter-party? The instrument begins in the common form; and after naming the parties, it proceeds to state, that it is witnessed, "that the said Weston, (the libellant,) for the consideration thereinafter mentioned, has letten to freight the whole of the said schooner with appurte-

nances to her belonging, except the cabin, which is reserved for the use of the master, and what room is necessary under deck for provisions, wood, water, and cables, for a voyage from this port (Boston) to Havana in Cuba, and thence back to this city (Boston) where she is to be discharged, dangers of the seas excepted." It then proceeds to state, that the libellant covenants, that the schooner shall be tight, staunch, and strong, and be sufficiently tackled and apparelled for such a voyage; and that it shall be lawful for the charterers, as well at Havana as at Boston, to load and put on board, both under and on deck, a loading of such goods, as they shall think proper, contraband goods excepted; and the libellant is to pay all and every charge of victualling and manning the schooner during the voyage, and is to furnish the schooner victualled and manned; and the other charges, port charges, pilotage, &c., are to be borne by the charterers; and they are to make advances, not exceeding $100, to the master during the voyage. In consideration whereof the charterers agree to pay to the libellant, in full for freight or hire, at the rate of $400 for each and every calendar month, and so in proportion for a less time, as the schooner shall be employed in the voyage, from the 1st of December, 1833, "within ten days after her return to Boston, or in case of loss, to the time she was last heard of." And in conclusion it states, "To the faithful performance of all and singular the covenants, payments, and agreements the parties aforesaid, each to the other, do hereby bind themselves, their heirs, executors, and assigns, especially the said Weston, the said schooner, and the said Bixby, Valentine & Co., the goods to be laden on board the said schooner, in the penal sum of $2,000 firmly by the said presents."

Such is the substance of the charter-party. And upon the construction of the terms of it, I cannot entertain a doubt, that Weston, (the libellant,) remained the owner for the voyage. The vessel was equipped, and manned, and victualled by him; and at his expense during the voyage; and he covenanted to take on board such goods in the voyage, as the charterers should think proper. The whole arrangements on his part in these respects sound merely in covenant. It is true, that in another part of the instrument it is said, that he has letten to freight, (which may seem to import a present demise or grant, and not a mere covenant,) the whole schooner for the voyage. But this language is qualified by what succeeds. And the whole schooner is not let; for there is an express exception of the cabin and certain portions of other room under deck. If the whole schooner, then, was not granted during the voyage on freight, how is it possible to contend, that the libellant did not still remain owner for the voyage? The master was his master, appointed by him, and responsible to him; the crew were hired and paid by him; and the victualling and manning were at his expense. He also retained the exclusive pos-

session of a part of the vessel for the voyage, and the control and navigation of her during the voyage. Taking, then, the whole instrument together, it seems wholly inconsistent with the manifest intent of the parties, that the charterer should be the owner for the voyage. It appears to me, that this case is governed in all its circumstances by decisions, which have been made by the supreme court of the United States. In Hooe v. Groverman, 1 Cranch [5 U. S.] 24, under circumstances far less cogent and expressive, the supreme court held the general owner to be owner for the voyage, although in that case the whole tonnage of the vessel was let for the voyage. The case of Mascardier v. Chesapeake Ins. Co., 8 Cranch [12 U. S.] 39, is almost identical with the present in its leading circumstances. And the court there laid down the broad distinction in the following terms: "A person may be owner for the voyage, who by contract with the general owner hires the ship for the voyage, and has the exclusive possession, command, and navigation of the ship. But where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter-party is considered as a mere affreightment, sounding in covenant; and the freighter is not clothed with the character or legal responsibility of ownership." Tried by this test, there cannot be a doubt, that the libellant remained the owner for the voyage. See also Gracie v. Palmer, 8 Wheat. [21 U. S.] 605, and Colvin v. Newberry, 1 Clark & F. 283. I am aware, that there are in the English cases some very nice distinctions, and perhaps some decisions not very easily reconcilable with each other. But it appears to me, that the current of authority in the courts of Westminster Hall ranges itself on the same side with the decisions of the supreme court, and with the decisions of the American state courts on the same subject. I do not go over the cases. Many of them will be found collected in Abbott on Shipping, and in the notes to the American edition of 1829 (pages 19–22, 173–178); in Holt's Law of Shipping (part 2, pp. 195, 196, § 15); and in the learned Commentaries of Mr. Chancellor Kent (3 Kent, Comm. 2d Ed. p. 137, lect. 45). See, also, Pickman v. Woods, 6 Pick. 251; Clarkson v. Edes, 4 Cow. 478; Christie v. Lewis, 2 Brod. & B. 416; The Master, &c., of Trinity-House v. Clark, 4 Maule & S. 288; Colvin v. Newberry, 8 Barn. & C. 166; s. c. on appeal, 1 Clark & F. 283. Some stress was laid, in the argument at the bar, on the fact, that the master received his letter of instruction from the charterers; and that the libellant gave him a copy of the charter-party only, and verbal orders to proceed accordingly. But I cannot perceive, how these circumstances vary, in the slightest manner, the legal predicament of the case. They are perfectly consistent with the libellant's remaining owner for the voyage.

The third and far the most difficult question is, whether there was a lien on the home-

ward cargo for the freight. In general, it is well known, that by the common law there is a lien on the goods shipped for the freight due thereon, whether it arise under a common bill of lading or under a charter-party. But, then, this lien may be waived by consent; and in cases of charter-parties, it often becomes a question, whether the stipulations are, or are not, inconsistent with the existence of the lien. For instance, if the delivery of the goods is by the charter-party to precede the payment or security of payment of freight; such a stipulation furnishes a clear dispensation with the lien for freight; for it is repugnant to it, and incompatible with it. On the other hand, where such payment, or security of payment of freight, is to be simultaneous or concurrent with the delivery, there the lien exists in its full force, and may be insisted on. See Abb. Shipp. pt. 3, pp. 173–178, c. 1, § 7. This doctrine is clearly established; and it especially formed the groundwork of the reasoning in Yates v. Railston, 8 Taunt. 293; Christie v. Lewis, 2 Brod. & B. 410; Tate v. Meek, 8 Taunt. 280; Saville v. Campion, 2 Barn. & Ald. 503; Faith v. East India Co., 4 Barn. & Ald. 630; and Gracie v. Palmer, 8 Wheat. [21 U. S.] 605.

The question, then, in the first place is, whether the present charter-party contains any stipulation incompatible with the notion of a lien; for otherwise it will clearly attach. The only clause bearing upon this point is that which provides for the payment of the freight "within ten days after her (the schooner's) return to Boston, or, in case of loss, to the time she was last heard of." This latter provision of this clause establishes the fact, that the payment of the freight was not in every event to be contingent on, or subsequent to, the delivery of the cargo; and the other clause by no means carries with it any implication, that the delivery of the cargo shall precede the payment of freight. By our laws the term of fifteen days from the arrival and report of the ship at the custom-house is allowed for the entry and discharge of the cargo; and in some cases twenty days is allowed. See duty collection act of 1799, c. 128, §§ 36, 56 [1 Story's Laws, 606, 622; 1 Stat. 665, 669]; Act 3d March, 1821, c. 180 [3 Story's Laws, 1819; 3 Stat. 640]. So that an unlivery may be rightfully postponed beyond the ten days after the return of the ship, when by the terms of the charter-party the freight would become due. It is quite remarkable, that the charter-party does not contain any stipulation for the delivery of the homeward cargo, or prescribe any time for its delivery. So that the parties are left afloat, as to this point; and their rights are to be disposed of by the general principles of law. The question, then, is, whether the claimants could by law insist upon a positive delivery within the ten days after the return of the schooner. I know of no principle of law, upon which that can be generally affirmed. The delivery must be within a reasonable time. But can that be

deemed an unreasonable delay, which falls short of the time allowed by the statute law of the country for an unlivery of the cargo? Besides; on what ground can the court say, that the libellant, if the goods were unlivered, might not insist upon retaining them until the ten days were passed, or payment, or security for payment, of the freight was given? The parties have not stipulated for a delivery of the cargo within the ten days, or for any delivery at all without payment of freight. And in a case of mutual silence on each side on the point, there seems no ground for a court to say, that a detention for the freight under such circumstances would be inequitable or unreasonable. Lord Tenterden in his excellent work on Shipping (part 3, p. 177, c. 1. § 7) has deduced from the cases this general result; that the right of lien for freight does not absolutely depend on any covenant to pay freight on delivery of the cargo. But it may exist, if it appears, that the payment is to be made in cash or bills before or at the delivery of the cargo; or even if it does not appear, that the delivery of the cargo is to precede such payment. Now, in the present case, the latter is the very predicament, in which the charter-party leaves this matter. But the case does not rest merely upon this negative inference. There is an express clause in the charter-party, (as we have seen,) by which the parties bind themselves, the libellant his ship, and the shippers their cargo, to the faithful performance of all and singular the covenants, agreements, and payments of the charter-party. This is a common clause in charter-parties. It is borrowed from the general maritime law, by which the ship is bound to the merchandise, and the merchandise to the ship. Abb. Shipp. pt. 2, p. 93, c. 2, § 5; Id. pt. 3, p. 169, c. 1, § 6 (b); Id. p. 170, § 7; Cleirac, Us et Cout. de la Mer, p. 72. Cleirac lays it down in express terms; and it is specially declared in the ordinance of Louis the Fourteenth in 1681, which Valin treats on this point, as an affirmance of the general maritime law. Id.; 1 Valin, Comm. liv. 3, tit. 1; Des Charte-Parties, p. 629, art. 11. Lord Tenterden in commenting on this clause, after remarking, that this principle of the maritime law cannot be carried into effect against the ship in England, from a supposed defect of the admiralty jurisdiction, at the same time adds, that the owners may be made responsible by a special action on the case at the common law, or by a suit in equity. He does not, however, treat this clause as senseless, if it were capable of a specific execution. Abb. Shipp. pt. 2, pp. 93, 94, c. 2, § 5. In another place, commenting on the same clause, he states, as the result of the authorities, (which I shall immediately consider,) that the part of it binding the cargo is inoperative; and that the lien for freight is not derived from it; but is derived from some general principle of law, or some special contract. Certainly the lien is derived from some general principle of law, or some special contract. Id. pt.

3, pp. 170, 171, c. 1, §§ 6 (b), 7. But the question is, whether this very clause does not constitute such a special contract. I contend that it does; and that its clear and determinate meaning is, that the cargo shall be responsible (among other things) for the payment of the freight. The words are of this purport; they are sensible in the place where they occur; they are as much a part of the instrument as any other clause; and it was clearly competent for the parties to enter into such an agreement, if they chose so to do. If the instrument had expressly declared, that there should be no lien on the cargo for the freight, it cannot be doubted, that the stipulation would have been obligatory upon the parties. That was expressly decided in the late case of Small v. Moates. 9 Bing. 574, where the judgment turned upon this very point. Now, I profess, that I cannot perceive, what difference there is in legal construction between such language, and the language used in this charter-party. The shipper binds the cargo for the performance of his covenants and payments under it. · And what is this but giving a pledge or lien upon the cargo for this purpose? If the party could not enforce that pledge or lien actively by a suit in rem, the clause at least furnishes him with a right to detain the cargo until his claim for freight is satisfied. And in the present case, where the parties have been silent, as to the delivery of the cargo without payment of the freight, the clause may, a fortiori, be insisted on to repel any presumption, that the parties had waived any lien on the cargo for the freight: for it would not then be bound for the payment. This right of detention under a contract was expressly recognized in Small v. Moates.

But let us now see, what are the authorities, upon which a different doctrine is maintained. The first case is Paul v. Birch, 2 Atk. 621, where the charterers had bound the goods to be put on board for the payment of the hire or freight; and afterwards became bankrupts. Lord Hardwicke gave full effect to the clause, as against the assignees of the bankrupts. But an attempt was made to charge the goods of third persons, who were shippers under the charterers, with the full amount of the hire or freight. This last claim was resisted: and Lord Hardwicke held these latter goods liable only to the extent of the freight payable to the charterers by the shippers. And this is in perfect coincidence with what is now the established law. See Christie v. Lewis, 2 Brod. & B. 410; Small v. Moates, 9 Bing. 574; Faith v. East India Co., 4 Barn. & Ald. 634. So that this case, as far as it goes, does in fact support, instead of impugning the doctrine. The other case is Birley v. Gladstone, 3 Maule & S. 205, where certainly a question did arise upon the meaning and effect of the stipulation now under consideration. The question there was, whether the owner of the ship was entitled to detain the cargo, not for freight generally, but for dead freight, that is, for the freight of goods not laden. The court held,

that he was not. Lord Ellenborough on that occasion said, "The clause is not familiar to us in England, but has been imported from Pothier." (In this his lordship is certainly mistaken, for it had an existence centuries before.) "It is, like the charter-party, I believe, of French origin: and I know not, whether there may not be some immediate proceeding upon it in that country." Beyond question there is such a remedy in France. But charter-parties did not originate in the French law. They were known in other countries at as early, if not at an earlier period. He afterwards proceeded to say: "I do not say, that a court of equity might not afford a remedy to the party under the clause, though there does not seem to be any instance of its being done. But at law, what lien is there under it? &c. It is absurd to imagine, that this clause, which cannot be mutually obligatory, was intended to give a lien on one side, without the like remedy on the other, &c. There has been no remedy afforded under it in a court of law, and still less by means of actual lien, &c. This is not freight earned within the terms of the charter-party. It falls under the general covenants, either for damage, or for providing a full cargo. But the party cannot have this suppletory remedy by way of lien. It would be going too far to hold, that this clause gave him a lien for the non-performance of covenants." The other judges concurred with Lord Ellenborough; but their opinions proceeded on the same grounds as his, and throw no additional light on the subject. The effect, then, of this decision is, that the clause is wholly nugatory and inoperative; that it is vox, et præterea nihil. The course of reasoning, by which it is sustained, amounts to this, that because by the law of England an active remedy by a proceeding in rem is not provided for in all cases under the clause, therefore no passive remedy by way of lien at law can exist for either party; and that though the language of the parties, binding the property, is clear, they cannot intend it, because there cannot be a mutual remedy, and it would be inconvenient for them to have their property bound for the performance of covenants generally, sounding in damages. I confess, that I cannot understand the ground, upon which such reasoning is to be supported. Where words are sensible in the place, in which they occur in an agreement, they are to be presumed to be used to express the intention of the parties, and to constitute a part of their agreement. They are not to be declared a nullity, because in the opinion of the court they may lead to inconvenient consequences, which the parties, if they had foreseen, would have guarded against. Courts are to construe instruments, and not make them for the parties. Besides; there is nothing irrational, or in a large sense inconvenient in parties binding their property for the fulfillment of their covenants sounding in damages. If the parties here had respectively said, that the ship and the cargo should stand mortgaged as security for the due fulfillment of the covenants on each side; or that each should have a lien therefor; it

would be difficult to find any ground of law to overthrow such agreement. Indeed, the case of Small v. Moates, 9 Bing. 574. instructs us, that such a clause would have been obligatory, and would have created a lien. See, also, Gladstone v. Birley, 2 Mer. 402.

The case of Birley v. Gladstone was afterwards brought into chancery, in order to ascertain whether there was a lien in equity under the clause. It is reported in 2 Mer. 401. Sir William Grant denied any relief, upon the ground, that a court of law had already decided, that the clause created no lien; and that the same construction must prevail in equity as at law, since the lien, if any, was of a legal and not of an equitable nature. On that occasion the learned judge said: "A court of competent jurisdiction has decided, that neither law nor contract has in this case given any such right. And, without directly contradicting that decision, it is impossible for me to say, that the plaintiffs have a right, &c. It was asked, what effect the clause could have, if it gave no lien, either in law or in equity? A court of equity is not bound to find an equitable effect for a clause, merely because the construction a court of law has put upon it would leave it inoperative. In truth, it has been copied from foreign charter-parties with very little consideration of the effect, that might be allowed to it by the law of this country. I think it very probable, that in other countries it would have the effect of entitling the ship-owner to retain the cargo for every sort of demand, that would accrue to him under the charter-party. If that be not the effect of it, I do not see what other effect it can have. But as I am bound by the construction which it has received from a court of law, and conceiving that this is not a case in which equity can give a lien, that does not legally exist, I must dismiss the plaintiffs' bill." Now, in this language of the learned judge, (and a truly great judge he was,) I most heartily concur. I put upon the instrument the very construction, which he gives it; and if that be the correct construction, and be the agreement of the parties, where is the principle of the common law, which prohibits giving effect to it, at least by way of a lien or right of detention for the freight? I know of no such principle. And the learned judge was right in making the suggestion, that the court of king's bench did not deny, that such a lien might by the law of England be contracted for. If then the terms of the contract are plain; if they have in the maritime law a clear and determinate meaning; it seems to me, that it is the duty of the court to give effect to that meaning, and to save to the parties the very rights and remedies, which they intended, and the maritime law would give them, at least as far as those remedies are within the compass of the common law. I cannot, therefore, assent to the decision in the case of Birley v. Gladstone in 3 Maule & S. 205. It seems to me utterly unfounded in principle; and I cannot otherwise interpret the language of Sir William Grant, than as a disapprobation of it, although he felt himself bound by it. And

I find, that the same view of the clause was taken by Mr. Chief Justice Parker in Pickman v. Woods, 6 Pick. 252, where, in delivering the opinion of the court, he says: "It is most usual (in charter-parties) to stipulate, that the goods are bound for the freight, or that freight shall be paid or secured on delivery; and in all such cases the lien is considered perfect, notwithstanding there are covenants in the charter-party for the payment of freight." Mr. Chancellor Kent manifestly maintains the same doctrine in his Commentaries, as a result growing out of, and in conformity to, the maritime law; and few judges have a better title than he to speak strongly upon questions of commercial and maritime law. 3 Kent. Comm. (2d Ed.) p. 220, lect. 47. See, also, the elaborate judgment of Judge Ware in Drinkwater v. The Spartan [Case No. 4,085], and The Rebecca [Id. 11,619], on the same subject.

My judgment. therefore, is, that the clause in question contains an express contract for a lien for the freight in this case; and that if it did not, still that it contains enough to repel any notion, that the delivery of the goods should precede the payment of the freight, or that the lien by the maritime law for freight was intended to be waived by the parties. The consequence is, that the libellant is entitled to a decree for the freight against the proceeds now in court. The decree of the district court [case unreported] is therefore affirmed with costs.

VOLUNTEER, The (ELLIOTT v.). See Case No. 4,398.