STEAMBOAT KEYSTONE, Respondent, v. MOIES *et al.*, Appellants.

1. If a consignee refuse to receive the goods consigned to him, it is the duty of the carrier to take such steps in relation to the goods as will advance the owner's interest and purposes consistently with a reasonable security to himself for his freight and charges; what he ought to do in a given case will depend upon circumstances; if, acting as agent for the owners, he pursues such course as men of ordinary prudence would follow, he will be protected by the law whatever may be the result.

2. A custom among steamboat carriers to return goods to the shipper if the consignee should refuse to receive them, and to charge freight upon the return trip as well as upon the out-going trip, would seem to be unreasonable if applied to all kinds and qualities of goods shipped.

*Appeal from St. Louis Law Commissioner's Court.*

This was an action to recover in behalf of the steamboat Keystone freight and charges upon certain iron castings shipped by the defendants at St. Louis and consigned to Eldridge Bro. & Co., at Wyandott, Kansas territory. It was in evi-

dence that the consignees refused to receive the castings at Wyandott. The boat brought them back to St. Louis. The plaintiff claimed seventy-two dollars freight to Wyandott, seventy-two dollars freight from Wyandott back to St. Louis, and six dollars charges. On the trial the plaintiff introduced two witnesses, who testified that the custom on the Missouri river is to deliver the freight according to the bill of lading, and, when the consignees refuse to receive it and pay charges, to bring it back and notify the shipper and charge the freight also on the back trip. The court gave the following among other instructions : " 1. Wherever there is a uniform usage or custom in a particular trade, parties are presumed to contract in reference thereto, and in such case the usage or custom is understood to form a part of the contract unless it is expressly excluded by them, or unless it be inconsistent with the terms of their agreement."

The jury found for the plaintiff the sum of one hundred and fifty dollars.

*Smith & Sedgwick*, for appellants.

I. The custom attempted to be proved was unreasonable.

*A. M. & S. H. Gardner*, for respondent.

I. The custom proved was reasonable and not at all inconsistent with the terms of the contract.

NAPTON, Judge, delivered the opinion of the court.

The custom of returning goods to the place of shipment, where the consignee at the place of delivery has refused to receive them, may be a very reasonable one when the freight is very small in proportion to the value of the goods. In such cases the consignor would probably prefer that the boat should bring them back, and a custom to this effect, as it would be entirely consistent with the consignor's interest, would only show that the carrier, in acting as the agent of the consignor, had discharged his duty and acted as the consignor himself would have done if he had been in a position

to be consulted. But where the goods are of a perishable nature, or where the freight constitutes a large proportion of their value at the place of consignment, such a custom would hardly obtain and would certainly be very burdensome to shippers. If a cargo of West India fruit is brought up from New Orleans and the consignee here refuses to receive it, would the carrier be justified in taking it back to New Orleans, at the hazard of losing it entirely and with a certainty that it would be worth greatly less there than here? If a cargo of salt or iron is shipped from here to a point high up the Missouri, shall the boat, in the event that the consignor refuses to receive it, bring it back to St. Louis, where the freight up and down will exceed the full value of iron or salt here? Such a custom, if it exists, would seem to be unreasonable, and could not therefore be acquiesced in by shippers, since it could be productive of no benefit to them. There is no doubt that the boat has a lien on the goods for its freight and is not bound to deliver them up to the consignee until the freight is paid. (3 Kent, 220; The Schooner Volunteer, 1 Sumn. 551; Abbott on Shipping, 37.) If the consignee refuses to receive the goods, the carrier may deposit them at the place of delivery in a warehouse, with directions to be delivered to the owner upon payment of charges. (Fisk v. Newton, 1 Denio, ——; Magill v. Potter, 2 John. Ca. 371.) In England the practice is to send such goods as are not required to be landed at any particular dock to a public wharf, and order the wharfinger not to part with them until the freight and other charges are paid. (Abbott on Shipping, 378.)

The principle upon which the carrier's duty is based, in the event of a refusal of the consignee to receive the goods, is simply to regard himself as an agent for the owners, and as such invested with authority to take such steps in relation to the goods as will advance the owner's interest and purposes consistently with a reasonable security to himself for his freight and charges. What he ought to do in a given case will manifestly depend upon the circumstances, and there

can be and ought to be no universal rule in course to be followed in all cases. If, acting as agent for the owners, he pursues such course as men of ordinary prudence would follow, he is protected by the law, whatever may be the result. In the case of Arthur v. The Schooner Cassius, 1 Story C. C. 97, Judge Story considered it the duty of the master to land the freight at the port of destination, and, if the consignees refused to receive it, " to place it in the hands of some trustworthy person for the security of his lien for freight, and subject thereto for the benefit and account of the owners." " No right," he adds, " even under such circumstances, could exist on the part of the master to sell the cargo unless it was perishable and might otherwise have been lost or have perished." If there is no warehouse or no responsible or trustworthy person at the place of consignment, as may happen at some landings on our rivers, the carrier would certainly not be authorized to leave them on the shore exposed to injuries by the weather or by depredations. (Ostrander v. Brown, 15 Johns. 39.) In such an event, he is thrown upon the rule to which we have already adverted, of taking such course as will secure his freight, and at the same time advance, as far as ordinary prudence can foresee, the interest of the shipper; and it is quite manifest that if the master lands the goods at the nearest or most convenient port above or below the point of consignment, where warehouses and responsible agents may be found, and apprizes the owners of what has been done, he has discharged his duty, and will not be held responsible for losses, if any should happen. This would undoubtedly be the law, where the cost of transportation entered very largely into the value of the goods at the place of their destination, and where, as a matter of course, the property would be more valuable to the owner at that place than at the place from which they were shipped. If the goods consisted of a package of jewels or of a box of costly articles, whose value was great in proportion to the cost of transportation, it might reasonably be inferred that the refusal of the particular consignee to whom they

were forwarded to receive them would justify and perhaps require the carrier to return them to the consignor. Such course would be justified on the same principle which would authorize the carrier to leave goods of another description in a warehouse at the port of destination or the port nearest thereto where warehouses could be found. In both cases it is consulting the apparent interest of the owners and at the same time securing the claim of the carrier for his freight.

We shall send the case back to be tried on these principles. The verdict was rendered under an instruction confining the jury to the mere question of a custom, about which the evidence was very slight and unsatisfactory. The steamboat masters, who were examined, spoke of a general practice of returning freight to the owners here where the consignees refused to receive it, but did not explain the character of the goods so returned and received and paid for. They may have been misled by one or two incidents falling under their observation, and supposed that a case here and there, perhaps perfectly consistent with our understanding of the law, constituted a custom universally applicable under all circumstances. We doubt the existence of a custom so totally destructive of the interests of shippers as was imagined to be established in this case. With the concurrence of all the judges, the case is remanded.