## CLARKSON *against* EDES.

When the general owner of a vessel parts with his ownership and possession in the vessel to a charterer, the latter is considered owner, and the former has no lien for freight;

Otherwise, where he does not part with the possession and control of the vessel.

ERROR from the C. P. of the city of New York. The action in the Court below, was *indebitatus assumpsit,* by Edes against Clarkson, for freight, primage and average, in respect to goods, &c. carried, &c. in a schooner, called Thetis, the plaintiff master, from Havana to New York, and for care and attendance, &c. about loading and unloading the goods, &c. The cause was tried in May term, 1824, in the Court below, before IRVING, first Judge.

On the trial, the plaintiff gave in evidence, two bills of lading, one of goods shipped by the Thetis, by Drake & Mitchell, of Havana, for New York, deliverable in good or-

In the latter case, he may maintain an action for the freight, in the name of the master, on the bills of lading.

Or he may enforce his claim by detaining the goods till payment, the law giving him a lien for the freight.

Where the general owners agreed to *freight* and *let* a schooner to D., Edes master, to proceed from New York to Havana, thence to Curacoa, thence to Jacmel, and thence to New York; the owners covenanting that she should be tight, strong, well manned, victualled and apparelled during the voyage; that D. might load, and discharge from on board, such cargo or cargoes, or parts thereof, in either of the ports or places, as by them should be ordered; the schooner to proceed as soon as dispatched by D., at either or any of the ports or places mentioned, direct, and without delay, to the next port or place, D. agreeing to deliver and receive the cargoes, or parts thereof, at all the places, along side, and within reach of the vessels; to pay the owners at the rate of $325 per month, at the end of every month, if in port, or on her arrival (if required,) with all port charges except at New York; also to advance what might be necessary for expenses, if wanted; sufficient room in the hold to be allowed for the provisions, wood and water, and for storage of the cables; and on the vessel arriving at Havana, or any other port mentioned, if D. should request it of the master or commander, the vessel to return direct to New York, in which case the voyage to be deemed ended, as if she had visited all the ports; *held,* that the general owners did not, by this contract, part with the ownership and possession of the vessel to D., so as to preclude their lien for freight; and that they might sue the consignee for the freight on the bill of lading, in the name of the master: and that a payment to the charterer, with notice of the owners' claim, would not protect the consignee.

Whether the general owner has parted with the ownership and possession to the charterer, must be determined from the charter party.

der, &c. at New York, (dangers and accidents of the seas excepted,) to Clarkson, or his assigns, he or they paying freight, &c. dated the 27th January, 1824; the other, of goods shipped by Clark & Co. on board the Thetis, for the same voyage, deliverable in like good order, &c. (with like exception,) to Clarkson or his assigns, he or they paying freight, &c. dated the 21st January, 1824. The defendant below admitted the receipt of the goods, and that he gave a receipt, reciting that a controversy existed between the owners and one Charles Douglass, as to which was entitled to the freight, and promising to hold it for the party who should prove to be legally authorized to receive it.

The plaintiff then rested, and the defendant, for the purpose of his defence, read a charter party, which was admitted to be correct, and to be executed by the owners of the schooner, and by Douglass, and that the freight for which this suit is brought was earned by the schooner, on the voyage made under the charter party; which was as follows:

"This charter party, made and concluded this 10th day of November, A. D. 1823, between William Lockwood & Co. and John Bulkley & Son, of the city of New York, of the first part, and Charles Douglass of the aforesaid city, of the second part, witnesseth, that the said parties of the first part have hereby agreed to freight, and to let to the said party of the second part, the whole of the schooner called the Thetis of New York, of the burthen of 99 $\frac{4.8}{9.5}$ tons, whereof Thomas Edes is master, for the following voyage, viz: to proceed from hence to the port of Havana; at and from thence to Curacoa, with the privilege of touching, if necessary, at a port or place on the south side of St. Domingo, on her way to the aforesaid port of Curacoa; at and from thence to Jacmel, St. Domingo, and from thence back to New York. The parties of the first part engage, that the said schooner shall be tight, strong and well manned, victualled and apparelled, and shall be so kept during the continuance of said voyage; that the party of the second part may load and discharge from on board said schooner, such cargo or cargoes, or parts thereof, in either or any of the above ports or places, as by them shall be ordered. **The**

said schooner to proceed as soon as dispatched by the said second party, at either or any of the aforesaid ports or places, direct and without delay, to the next port or place, the usual dangers of the seas excepted. The party of the second part doth hereby agree to deliver and receive the cargoes or parts thereof, as may be at all and every place alongside and within reach of the vessel's tackles, she being first anchored or moored at the usual place at each port. In consideration of which, the party of the second part agrees to pay to the parties of the first part, or to their agents or assigns, at and after the rate of 325 dollars for every calendar month, payable at the expiration of every month, if in port, or immediately on her arrival thereafter, (if required by the parties of the first part,) in the currency of the place wherever she may be, together with all and every port charge, excepting at the port of New York; and also to advance from time to time, on account of the charter, whatever moneys may be required for the necessary expenses or disbursements of the vessel, if any should be wanted. For the true and faithful performance of said voyage, the parties hereunto bind themselves each to the other, that is to say, the parties of the first part, the said schooner, her tackle and apparel, and the said party of the second part, the cargo or cargoes to be ladened on board, in the penal sum of 1000 dollars lawful money of the United States. In witness whereof, they have hereunto interchangeably set their hands and seals on the day and the year first above written.

"It is understood that sufficient room in the hold of said vessel is to be allowed for the necessary provisions, wood and water, during the voyage above mentioned, and also for storage of the cables.

"It is also further agreed and understood, by the parties to the foregoing instrument of writing or charter party, that, upon the arrival of the said schooner Thetis, at the port of Havana, or at any other of the foreign ports or places mentioned in the foregoing instrument, if the party of the second part shall request of the master or commander, the immediate and direct return of said schooner from Havana, or from any of the other of said ports, directly to the port of New

York, said master or commander shall be obliged so to do; and upon the arrival and discharge of said schooner, in the port of New York, said voyage alluded to in the foregoing instrument of writing, shall be deemed to have been concluded and completed, as effectually as if said schooner had visited or touched at all the ports mentioned in the foregoing charter party. In witness whereof, the parties have interchangeably set their hands and seals hereto."

The defendants then gave in evidence the receipt in full by Douglass for the freight received of Clarkson, the defendant below, dated April 10th, 1824. This payment was made on Douglass' indemnifying Clarkson against the plaintiff's claim.

Upon this proof, the plaintiff's counsel submitted, that the owner under the charter party had the sole right to freight, of the consignees; that the payment by Clarkson to Douglass was not *bona fide*, and that this was the only question for the jury.

On the part of the defendant, it was contended that Douglass had the sole right to collect the freight under the charter party; but that, if the owners had a lien on the goods of the consignees, they had lost it on the possession of the goods coming to the defendant; and that they could not maintain a suit on the bills of lading for the freight, but must look to the charterer under the charter party, or to the defendant on the special agreement entered into by him with the plaintiff; thirdly, that, even if the owners had a right to collect the freight, there was an equal right in Douglass; and, as Douglass had first received it, the payment was good; fourthly, that, before the owners could have a right to collect the freight, they were bound to show, by the terms of the charter party, that they had demanded payment of the monthly freight of Douglass, who refused to pay it; fifthly, inasmuch as the bills of lading did not make the freight payable to the master, he had no claim for it under the facts.

The Judge gave his opinion, that it was evident from the defendant's receipt of February 18th, 1824, that the cargo for which this freight was claimed was received by the defendant with a knowledge that a controversy existed between the owners of the vessel and the charterer, Doug-

lass, as to which was entitled to receive it, and that the defendant was to be accountable to the one who should be adjudged lawfully entitled; his payment was with a view to this accountability; the more so, as he took an indem‧ nity. That this accountability was evidently to depend on the decision of some Court; and the only question, therefore, would be, who was the owner and possessor of this vessel for the voyage? That if the general owners were to be in possession of the vessel, and have the control of her during the voyage, they were entitled to the freight. That this would depend on the construction of the charter party, the various provisions of which he examined; and held, that they had not parted with the ownership and possession. That being both owners and in possession, they were entitled to receive the freight and to enforce the claim, either by detaining the goods until the freight was paid, or by bringing an action on the bills of lading.

To this opinion the defendant's counsel excepted, a verdict was found for the plaintiff for $109 74, on which judgment was rendered in the Court below, and the cause came here upon a bill of exceptions.

*T. A. Emmet*, for the plaintiff in error, contended, 1. That the owners had no right to look to any other than Douglass for the moneys due under the charter party. (*Hutton* v. *Braggs*, 7 Taunt. 14. *Christie* v. *Lewis*, 2 Brod. & Bing. 410.) And he distinguished this from *Hooe* v. *Groverman*, (1 Cranch, 214;) and he also cited as bearing upon this point, *Gracie* v. *Palmer*, (8 Wheat. 632, per Johnson, J.) *Chandler* v. *Belden*, (18 John. 157, per Spencer, J.) 1 Com. on Cont. 359–60; Doug. 104; Abbott, 228; *Faith* v. *E. I. Co.* (4 B. & A. 630;) and *Tate* v. *Meek*, (8 Taunt. 280, 293.)

2. The owners had, at any rate, no other right than a mere lien on the property, and having parted with this, had no right to sue.

3. If the owners might sue, the charterer had the same right; and he, having first carried his right into effect, deprived the owners of theirs as against Clarkson.

*J. Anthon*, contra, contended, 1. That the bills of lading being in the common form, the freight money was, from the

nature of the instrument, payable to the owners; (Abbott, pt. 3, ch. 2;) and the master may collect it in his own name. (Id.)

That Messrs. Lockwood & Co. and Bulkley & Son were to be considered the owners, he cited *Marcadier* v. *The Chesapeake Ins. Co.* (8 Cranch, 49, per Marshal, C. J.) *Christie* v. *Lewis*, (2 Brod. & Bing. 435;) *Gracie* v. *Palmer*, (8 Wheat. 605;) *Saville* v. *Champion*, (2 B. & A. 511, per Abbott, C. J.) *Hooe* v. *Groverman*, (1 Cranch, 237;) Abbott, pt. 3, ch. 1; *Faith* v. *East Ind. Co.* (4 B. & A. 637, per Parke, arg.) 2 B. & A. 510, Campbell, arg.

2. Though the owner's lien be gone, the right of action on the bill of lading remains.

*Emmet*, in reply, cited *Yates* v. *Railston*, (8 Taunton, 293.)

(And both the counsel examined at large, the different clauses of the charter party, and the cases cited, in reference to the question who should be deemed owner.)

WOODWORTH, J.    The plaintiff below was master of the schooner Thetis, and declared for the freight of certain goods. On the arrival of the vessel at New York, the goods were delivered to the plaintiff in error, who gave a receipt, promising to pay freight to the party legally authorized to receive it. This arrangement was made in consequence of a controversy between the owners of the vessel, and one Douglass, to whom they had executed a charter party for the voyage, both claiming a right to the freight. The defendant in the Court below gave in evidence the charter party, and proved that on the 10th April, 1824, he paid the amount of freight to Douglass, on receiving a bond of indemnity. The Judge held the only question to be, who was the owner and possessor of the vessel for the voyage? and that if the owners of the vessel were to be considered in possession, they were entitled to receive the freight, and that would depend upon the construction of the charter party; that, in his opinion, the owners had not parted with the ownership and possession; and were entitled to receive the freight, and to enforce their claim, either by detaining the goods until payment, or by bringing an action on the bills of lading.

To this opinion the defendant excepted.

The right to collect the freight is exclusive in one or the other of the parties. This right may be enforced by insisting on the lien until payment, or by resorting to an action, which may be sustained in the name of the master, on the bills of lading, for the benefit of the owners and possessors of the vessel. Whether payment to the charterer exonerated the defendant, necessarily depends on the question, whether, by the terms of the charter party, he had the control, navigation, and possession of the vessel for the voyage. From an attentive consideration of the various clauses and provisions of the charter party, I am of opinion that the general owners had not parted with the ownership and possession of the vessel, and consequently they were entitled to receive the freight.

The law is correctly laid down in *Marcadier* v. *The Chesapeake Insurance Company*, (8 Cranch, 49.) It is, that "a person may be owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command and navigation of the ship. But where the general owner retains the possession, command and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter party is considered a mere affreightment, sounding in covenant; and the freighter is not clothed with the character or legal responsibility of ownership. In the first case, the general freighter is responsible for the conduct of the master and mariners during the voyage. In the latter case the responsibility rests on the general owner."

The construction must be on the whole instrument, in order to determine whether the owner intended to part with the possession.

The first clause declares that the parties of the first part had agreed to freight, and to let the party of the second part, the whole of the schooner Thetis. This expression, taken singly, would undoubtedly import, that Douglass had the possession and control of the vessel. In *Marcadier* v. *The Chesapeake Insurance Company*, the language is substantially the same. The charter party contained these

words: " Hath granted, and to freight let the brig, except-
ing and reserving her cabin for the accommodation of the
captain." Yet the Court held that the ownership and pos-
session were retained by the general owner, in consequence
of subsequent clauses, which compare with those in the
charter party in question.

The second and third clauses are, that the party of the
second part may load and discharge from on board the
schooner, such cargo, in either of the ports or places, as, by
them, shall be ordered ; and that the party of the second
part agrees to deliver and receive the cargo or parts there-
of, as may be, at all and every place, along side and with-
in reach of the vessel's tackles, she having first anchored.

It seems to me that these clauses are inconsistent with
the idea of actual ownership and possession in the freighter.
If that had existed, there was no necessity for such stipu-
lations ; but, on the ground that the general owners (al-
though stipulating that the vessel should be employed for
the voyage, in carrying freight for the charterer) still re-
tained possession and control of the vessel, the clauses are
intelligible and proper in requiring the charterer to conform
to them.   In *Saville* v. *Campion*, (2 B. & A. 511,) such
a clause are considered as conclusive that the possession
was retained by the general owner.

The fourth clause, which provides that sufficient room
in the hold is to be allowed for the necessary provisions
and water during the voyage, goes far to determine the
meaning of the contract.   From this, it is plainly to be in-
ferred that the general owners considered themselves as
having possession of the vessel, and that they were to navi-
gate her, and, therefore, made this reservation to enable
them to perform.

The vessel was to be navigated at the expense of the gen-
eral owners, which shows very clearly that their ownership
and possession continued.   If it had been otherwise, such
a provision in the contract would not have been inserted.

It is also provided, that the vessel shall be tight, strong
and well manned, victualled and apparelled during the voy-
age.  If the doctrine contended for by the plaintiff in error
be correct, what concern had the general owner with man-

ning and victualling the vessel. The cases of *Hooe* v. *Groverman*, (1 Cranch, 237,) and *Marcardier* v. *The Chesapeake Insurance Company*, (8 Cranch, 50,) are very decisive as to the effect of such a clause.

There are other parts of the charter party which serve to strengthen this construction, but I consider it unnecessary to notice them.

There is no doubt that the owner may waive his right to receive the freight, and if the charter party clearly show that he intended to resort to the charterer solely, the right cannot be enforced. In the case of *Chandler* v. *Belden*, (18 John. 157,) the stipulation was to receive $500, in advance, and the residue in three equal payments at 30, 60, and 90 days from the end of the voyage. This was held to be a waiver of the lien; but in the present case no such intent is indicated. Whatever remained unpaid at the return of the vessel, was then due and payable.

The judgment should be affirmed.

SUTHERLAND, J. concurred.

SAVAGE, Ch. J. The important inquiry is, who was the owner of the Thetis, for the voyage in question? Doubtless, when the charterer becomes owner for the voyage, there is no lien of the general owner for freight. It exists only when the carrier for freight is also owner for the voyage. The question of ownership must be determined by the charter party, the contract between those claiming the ownership. It is substantially this:

1. The owners, Lockwood & Co. and Bulkley & Son, agreed to freight and to let to Charles Douglass, the vessel, Thomas Edes, master, to proceed from New York to Havana, thence to Curacoa, thence to Jacmel, and thence to New York.

2. The owners covenant, that the vessel shall be tight, strong, and well manned, victualled and apparelled, and so kept during the voyage, and that *Douglass may load and discharge* from on board the schooner, such cargo or cargoes, or parts thereof, in either or any of the above ports or places, as by them shall be ordered; the schooner to pro-

ceed as soon as dispatched by the party of the second part at either or any of the ports or places mentioned, direct, and without delay, to the next port or place. The party of the second part agrees to deliver and receive the cargoes, or parts thereof, at all the places along side, and within reach of the vessel's tackles.

3. In consideration whereof, Douglass agrees to pay the parties of the first part, at and after the rate of $325 per month, at the end of every month, if in port—or on her arrival (if required) with all port charges, except at New York: also to advance what may be necessary for expenses, if wanted. The parties bind themselves, i. e. the owners, the vessel, tackle and apparel, and Douglass, the cargo, &c. in the penalty of $1000.

4. Sufficient room in the hold was to be allowed, for the provisions, wood and water, and for storage of the cables.

5. On the vessel's arriving at Havana, or any other port mentioned, if the party of the second part shall *request* of the master or commander, the direct return from such port to New York, he shall be obliged so to do; and upon her return to New York, the voyage to be ended, as if she had gone to all the ports.

In *Vallejo* v. *Wheeler*, (Cowp. 143,) the charterer was considered the owner. The facts of the case are not fully stated; but it appears that the charterer had appointed the master, and that the owner of the hulk had nothing to do with the voyage. In *Hutton* v. *Bragg*, (7 Taunt. 14,) the owner let his ship to the charterer from London to the Cape of Cood Hope, and back; the master having liberty to reserve the cabin for his sole use, and the usual accommodation for the crew and ship stores. The charterer covenanted to pay a certain sum in freight, for the voyage out and home. The Common Pleas held the charterer the owner for the voyage. In this case, the charter party was in terms of letting to him, as remarked by Abbott, Ch. J. in *Saville* v. *Campion*, (2 B. & A. 512.) In this last case, *Hutton* v. *Bragg* was doubted, and it was held that the owner had not parted with the possession of his ship. The contract was, that the commander should take on board a

full cargo for the freighter, reserving room for the provi- sions and cables; proceeding to Madeira, there to receive from the freighter's agent such goods as he might think fit to load; thence to Madras or Calcutta; and thence to London : all the cabins, except one, to the freighter, who should send a supercargo ; the freighter to pay, after the voyage was complete, £14 per ton upon the ship's regis- tered tonnage, and the time of payment specified ; the su- percargo to direct the stowage of the goods laden, but in no other manner to interfere with the captain's authority.

The question seems to have been the most fully exa- mined by the American courts.

In *Hooe* v. *Groverman*, (1 Cranch, 214,) the owner had " granted, and to freight letten," the whole *tonnage* of the vessel. Marshal, Ch. J. places some weight on this phrase- ology, and also on the covenants by the owner, to deliver the cargo; that the vessel was to be kept and manned by him ; and that the charterer was to pay the freight. He says the owner, Groverman, is to be considered the owner for the voyage. Again, in *Marcadier* v. *The Chesapeake Insurance Company*, (8 Cranch, 49,) it is said by Mr. Jus- tice Story, who delivered the opinion of the Court, " A per- son may be owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command and navigation of the ship. Such is understood to have been the case of *Vallejo* v. *Wheeler*. But when the general owner retains the posses- sion, command and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter party is considered as a mere affreightment, sounding in covenant, and the freighter is not clothed with the character, or legal responsibility of ownership." In the case of *Gracie* v. *Pal- mer*, (8 Wheat. 605,) the owners *let*, and the charterer *hired* the vessel to freight for the voyage. Then followed several covenants, by the owners, to navigate the ship, to load and unload the cargo, &c. Mr. Justice Johnson, who delivered the opinion of the Court, says, " The ship owner, who lets his ship to hire to another, whether manned and equipped or not, enters into a contract totally different from him who engages

to employ her himself in the transportation of the goods of another. In the former case he parts with the possession to another, and that other becomes the carrier. In the latter, he retains the possession of the ship, although the hold may be the property of the charterer; and, being subject to the liabilities, he retains the rights incident to the character of a common carrier." In *M'Intyre* v. *Bowne*, (1 John. Rep. 238,) Mr. Justice Thompson says, "It appears the assured equipped the brig, hired the master and crew, paid them, furnished the provisions and other necessaries for the voyage, excepted half the cabin, the privilege of 20 barrels on account of the master, &c. Under such circumstances, I should not consider A. & B. (the charterers) as owners for the voyage." In *Hallet* v. *The Col. Insurance Company*, (8 John. Rep. 276,) the Court say, the master of the vessel was to be considered as owner *pro hac vice*, or for the voyage insured. There was a complete letting of the entire vessel for the voyage. The master was to victual and man her at his own cost. He had the whole management and control, &c. In *Chandler* v. *Belden*, (18 John. 162,) the only point decided is, as to the owner's lien, which was held to be waived by an express agreement regulating the time and manner of paying freight, by stipulations in a charter party, and especially as the cargo was deliverable before the period of payment arrived.

These cases do not decide the present question; but they do decide that the general owner has a claim and lien for the freight, and that must continue, unless the owner has parted with it, either by constituting the charterer owner for the voyage, or by postponing payment beyond the time when the goods are to be delivered.

The question who was owner, must be determined by the charter party. Was it, then, the intention of these parties that the owner should relinquish his ownership for the voyage? He first lets the whole of the vessel, and if the charter party had stopped here, there could be very little doubt on the question. *Secondly.* The owners covenant that the vessel shall be strong, well manned and provided during the voyage, and that Douglass may load, &c. Why

this permission, if Douglass was the owner? Had that been the understanding of the parties, surely the charterer would have the right to load and unload what cargo he pleased, when and where he pleased, without a covenant from those who had parted with all interest in their ves sel. The owners further covenant that the vessel *shalt proceed* so soon as dispatched, &c. From this, it seems, the owners directed the movements of the vessel. They then had the control and navigation of her. The charterer agrees to *deliver* and *receive* the cargoes along side, &c. To whom was he to deliver? to his own agent? to himself? such a covenant would be preposterous. But if the captain is considered the agent of the owners, then indeed there is great propriety in the covenant.

It was urged in argument, that the clause providing for sufficient room in the hold to be *allowed* for provisions, &c. shows that the charterer was in possession of the vessel. I do not draw that inference. I think it proves that the charterer had the right to occupy the whole vessel with his goods, excepting that part reserved or *allowed* for pro visions, water, cables, &c.

But the last provision in the charter party seems to me to settle the question, if there be any doubt upon its previ ous parts. On the vessel's arriving at Havana, she was to return, *if the charterer requested it.* Now why *request* his own servant to obey him? If the charterer was in possession, and had the control and navigation of the ship, surely this covenant is nonsense. Not so, on the supposi tion that the owners retained the posession.

I am of opinion that the judgment of the Court below be affirmed.

Judgment affirmed.