## Case No. 10,987.

### PERKINS v. HILL.

[2 Woodb. & M. 158.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1846. [2]

CHARTER-PARTY—LOADING—FREIGHT LIENS—BILL OF LADING.

1. Where A. takes a charter-party of a vessel for a voyage to Cuba and back, at $400 per month, payable three days after her return, the owners furnishing officers, crew, and provisions, he has a right to load the vessel himself, or allow others to do it, under express contract with him.

[Cited in Donahoe v. Kettell, Case No. 3,980; Grand v. The Ibis, Id. 5,682.]

2. In such case no implied promise or obligation seems to arise in others, who make such contract with him, to pay freight to the captain or owners, but any liens or implied obligations, which are raised, were to him, or in his behalf, in aid of the express contract with him.

[Cited in The Eliza, Case No. 4,347.]

3. More especially is this the case, when at the bottom of the charter-party is a memorandum, stipulating by the hirer of the vessel, that the captain or owners may collect the freights on the voyage back, towards payment of the sum due from the hirer in the charter-party; and the freight now in dispute is on goods carried out, and not back.

4. A bill of lading, taken from the captain by him who makes the contract for freight with A., and containing no express promise or condition to pay freight to any particular person, does not change the obligation as to freight under the special contract to pay it to A., but is taken as evidence of property, to be forwarded to the consignee in Cuba.

5. The consignee there may be liable for freight before the goods are delivered; but it

———

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

[2] [Affirming Case No. 10,986.]

is to A., and not the captain, unless as agent and in behalf of A., and that lien is lost by the delivery of the article to the consignee.

This was an appeal from the decree of the district court, dismissing the following libel. [Case No. 10,986.] It was one purporting to claim compensation for the freight of certain merchandise belonging to the respondent [John S. Hill] on board the schooner Austin, from Boston to Havana, commanded and partly owned by the libellant [George Perkins, Jr.]. It contained averments that the vessel was chartered by the owners to one Joseph Green, April 15, 1845, for the voyage to Cuba and back, at $400 per month, payable in three days after her return. It was further stated, that Hill had taken of the libellant a bill of lading of the goods, freight payable "as by charter-party," and that a reasonable freight for what Hill owned on board was $1000, which had not been paid by him or his consignee.

The answer averred, that under the charter-party, Green had the exclusive right to load the schooner with his own goods or those of others, and receive the freight therefor; that the libellee agreed with Green for the carriage of the articles he shipped on board, and owed him alone therefor; that accordingly no demand for freight was made by the libellant of the consignee of the goods when delivered in Havana; that only one-third of the fish and none of the onions, which constituted his articles, belonged to the libellee; and that Green being indebted to him more than the amount of freight, and an express contract having been made with Green to pay him, no implied promise ought to be raised for the payment of the freight to the master. In a supplemental answer the libellee added further, that the property was all placed on board by Green, but a portion of it afterwards sold to the libellee; and that this was known to the libellant; and no agreement was asked or made to pay to him any specific sum as freight therefor. The charter-party and bill of lading were put into the case, and agreed in substance with what is averred about them in the libel. At the bottom of the latter, however, was a memorandum to this effect, that any freights due on the voyage home, might be received by the master, the libellant, and accounted for towards the amount Green was to pay monthly for the vessel under the charter-party.

The following statement of facts was agreed upon, which contains more details on some points than has already been given:

Joseph W. Green chartered the schooner Austin for the voyage referred to in the charter-party, on the 15th day of April, A. D. 1845. He had previously chartered the same vessel five or six times. The vessel was wholly laden by Green. The cargo consisted of 250 casks codfish, 1400 qtls., $3850; 200 barrels onions, $250; 100 barrels potatoes, $125; 3,000 feet lumber, $42,—$4267. After

the vessel was chartered, about the twenty-second day of April, Green being in debt to Hill, proposed to him that he should take an interest in the fish, in order to discharge the debt in part. Accordingly Hill agreed to become interested in one third the value of the fish, and Green the remaining two thirds. Hill advanced three fourths of the value of the fish and onions; bill of lading and invoice made out in the name of Hill by his clerk, and consigned to his correspondent, and by the clerk carried to Green's store, and bill of lading returned, signed by the captain, it being the usual course of business to obtain advances and ship the property in the name of the merchant making the advances for his protection. The fish was delivered from the store of Green, onions purchased by Green, placed on board by him, and shipped on his account by Hill. Hill agreed to account with Green for two thirds of the net proceeds of the fish, and to allow him in account the freight of one third of the invoice of the fish at a just and customary rate. The proceeds of the fish and onions were returned by some other vessel than the Austin, but were not sufficient with the freight of one third of the invoice of fish to satisfy Green's indebtedness to Hill. Perkins was in and out of the counting-room of Green, or on board the vessel while the cargo was loading, but did not know that Hill had any interest in the cargo until he signed the bill of lading. It was the usual course between Perkins and Green to have the bills of lading filled out "as per charter-party." Green testified that Perkins did not trouble himself about agreements he (Green) had made with others; he signed the bills of lading and went to sea; he knew to whom the property belonged when he signed the bills of lading, but Perkins had requested to have bills of lading in previous charters made out as per charter-party. And Green also testified that he told Hill he might fill out the bill of lading, freight free, or as per charter-party, and Green told Hill, that it would be well for him (Hill) to have the bill of lading filled out as per charter-party. The balance demanded by the libellant, $239.65, would be a fair freight for the fish, by a general ship.

Record of the court is in evidence, containing libel, answer, and amended answer, charter-party, bill of lading, and also the original invoices of the fish and onions which Hill received from Green, one being "Invoice of fish delivered schooner Austin, by J. W. Green, to be shipped to Havana by Mr. John S. Hill. he having one third interest, the balance for account of said J. W. Green;" and the other being, "Invoice onions delivered schooner Austin, by J. W. Green, to be shipped for his account to Havana by John S. Hill."

C. P. & B. R. Curtis and Mr. Hubbard, for libellants.

Edward Blake, for respondents.

WOODBURY, Circuit Justice. There can be little doubt in this case as to the original intent of these parties. Green had hired the whole of the schooner for a voyage out to Havana and back; and was to make no payment for the price agreed on in the charter-party till three days after the return of the vessel. Hill, a creditor of Green, after the latter had loaded the schooner out, purchased of him a part of the cargo, and agreed to have it carried by Green for him to Havana, and there delivered to Hill's consignee; and a bill of lading was taken of it from the master to show that this portion of the property belonged to Hill, and was to be forwarded and delivered to his consignee, in order that the latter might sell the cargo for him at Havana. There is no doubt that Green had a right to make such a contract with Hill for carrying the property sold to the latter. Abb. Shipp. 167, 246; Poth. Mar. Cont. p. 14, § 20. Green had acquired the authority to load the whole vessel with goods, either his own or belonging to other people; and neither the master nor owners had a right to take goods on board of others and charge freight without his permission, or unless in his behalf. Nor had they any right, by the charter-party, to demand freight for the use of the vessel, except as stipulated in the charter-party from Green himself, and that not till three days after the return voyage ended. Again, Hill, in point of fact, made no contract with Perkins to pay him freight; and Perkins was entitled to none on the cargo out till after the return of the vessel home, and then from Green alone. It also deserves special notice, that there is a memorandum at the bottom of the charter-party just referred to, in which Green agreed with Perkins that the latter might collect and apply the freights home towards what Green would owe, after her arrival here, for her whole voyage out and back. This memorandum is not only evidence that, without it, Green was understood between them as entitled to receive from others all the freights both ways, where he did not load the vessel entirely himself; but that they intended to except nothing from that general understanding but the freights home, mentioned in the memorandum.

In most cases, in charter-parties like these, the cargo is expressly made bound or liable for the freight due on the charter-party, and with no such memorandum as is before referred to, then the cargo may be under a lien for the freight to the owners. But here the existence of such a provision, and the insertion of a memorandum qualifying it, such as has been recited, leads to the opposite conclusion, as to all the cargo and freights on it, belonging to third persons on the voyage out. And it is very questionable whether the cargo belonging to third persons is ever held by that customary clause in the charter-party, but merely the cargo belonging to the charterer. Such was the

cargo in The Volunteer [Case No. 16,991]. It may be held in aid of the freight to the charterer, but not in aid to the owner. His own cargo the charterer might well pledge, to secure the freight due to the owners, but not so well the cargo, which belonged to third persons, and the freight for which was to be paid by agreement to himself, and not the owners of the ship. Hill then not only made his bargain with Green, but Perkins had no right to make one with him, unless as agent for Green, for freight outwards, and to which Green, and not he in his own right, would be entitled. For these reasons, also, Hill could be liable to nobody for the freight different from his express bargain with Green, unless he made a new and express arrangement with Perkins, assented to or authorized by Green. See cases of that kind collected in The Volunteer [supra].

The only pretence set up for such a new arrangement here, which is plausible on the evidence, is the bill of lading taken of Perkins, and arguing that this constitutes a new and express agreement to pay freight to the master. But this bill was taken and given not to create any new contract as to freight, as is inferred from some cases, such as The Rebecca [Case No. 11,619], and from 3 Kent, Comm. 218. It promises to pay freight to no person by name. It specifies no new amount, or, indeed, any amount except as by the charter-party. That expression must mean at the rate in the charter-party, according to his quantity of goods, and at the time mentioned therein, or it was a form in this case used without much meaning of any kind. Under the circumstances, and being so general, it could not be presumed as intending to depart from what had before been arranged with Green. and who had the exclusive right to make or permit such arrangement with Hill binding the freight. In truth, the bill of lading was probably given in this, as in most other cases, as an acknowledgment that the property, named in it, was on board and belonged to the person to whom the bill ran, the libellee in this case, and not as an obligation from the shipper to pay freight to the master, when it was not so expressed, and when the master had no right to demand it by the charter-party. If taken as security for the freight, the obligation should run to the captain, and not from the captain, or the bill should expressly provide for the delivery of the goods only on the payment of freight to him. But being given here, diverso intuitu, and not to secure freight, it would be a perversion of its use and design to treat it as a contract for the payment of freight, and to a different person from the charterer of the whole vessel, and with whom an express arrangement had been made for carrying the articles contained in it. Next, should there be an implication raised here to pay freight to persons different from those named in the express agreement? I think not in this instance.

The cases where an implication is raised in favor of the master for freight, aré generally those where no express agreement was made with any owner or charterer, and undoubtedly it then arises. Moore v. Wilson, 1 Durn. & E. [1 Term R.] 659; Robinson v. Marine Ins. Co., 2 Johns. 323. So the cases where the goods are at times liable for freight, or a lien exists on them for it, this is in aid of such an implication, when no express contract is made (4 Adol. & E. 260), or, if made, is not opposed to the implication. Abb. Shipp. 376. Or it is in aid of the express contract, and to secure its fulfilment to the same person. Barker v. Havens, 17 Johns. 234; Shepard v. De Bernales, 13 East, 565; 2 Maule & S. 303; Gracie v. Palmer, 8 Wheat. [21 U. S.] 605. Certain Logs of Mahogany [Case No. 2559]. Or it is where the master retains or reserves a part of the vessel when chartered. He might of course use that, or collect freight for that, without conflicting with these principles. The Volunteer [supra]. So retaining a part, and having the whole goods on board, bound to pay the freight to the owner, may be some evidence of a right to receive profits remaining in him, or intrusted to him by the charterer himself. [Talbot v. Seeman] 1 Cranch [5 U. S.] 24; [Gracie v. Palmer] 8 Wheat. [21 U. S.] 605; [Marcardier v. Chesapeake Ins. Co.] 8 Cranch [12 U. S.] 39; 1 Clark & F. 283. But even this evidence may be rebutted or superseded by an express contract with a particular freighter.

On a like principle rests the claim against the consignee. It is either in support of one of those implied or express liabilities, and not for the former against the latter, or it is on account of the lien generally possessed on the goods, and which the master, when it exists, can enforce or not, at his pleasure. Abb. Shipp. 286; Clarkson v. Edes, 4 Cow. 470; 3 Bing. 283; 13 East, 399; Small v. Moates, 9 Bing. 574; Faith v. East India Co., 4 Barn. & Ald. 630. And if the consignor is liable where the consignee is, on the ground of the latter being his agent, and the consignor deriving the benefit, the result, under the views just expressed, would be the same, as it would be a liability to the charterer, and not the master, except in behalf of the former, and would not help in any view the claim now set up by the master, as the consignee and the goods have both been released. If the goods have been delivered to the consignee, or time allowed for payment of freight, the lien is lost. 4 Adol. & E. 260; The Volunteer [supra]; Story, Bailm. § 588; 2 Ld. Raym. 752; 6 East, 622. It is, to be sure, a general rule, that the consignor is bound for freight (Story, Bailm. § 589; 1 Durn. & E. [1 Term R.] 659; 17 Johns. 234; and other cases cited), and continues to be bound till payment or discharge. But to whom is he bound for it, is the great question here; and to whom it is to be paid depends, as before remarked, on the facts

and the cont·acts. If a bill of lading is taken beside the contract, expressing that the freight is to be paid by any person or to any person, this taking of such a bill may be an implied contract by the shipper, who takes it to conform to that provision, though not signed by him, and certainly binds the consignee if he takes the articles or bill under such a clause, expressly making him liable. Abb. Shipp. pt. 4, c. 9; Dougal v. Kemble, 3 Bing. 383. But if no such stipulation is made· expressly in the bill of lading, as none is in this case, the payment to any particular person, or by any particular person, is left to other express arrangements, or to implied obligations from all the facts when there are no such arrangements. What has given rise to an effort to overcome the obvious and natural liabilities here is probably the fact, that after all of them took place, and after the sailing of the vessel, Green proved to be insolvent, and stopped payment July 11, 1845. So that when the hire of the vessel under the charter-party became due from Green to Perkins, three days after the return home of the schooner, Perkins was unable to collect what was due into $239, the amount now demanded of Hill.

The struggle then arose, whether Hill or Perkins, both creditors of Green, should have the benefit of this freight; and when we consider that Hill had contracted to pay it to Green and not to Perkins, and that Perkins had no right to it on the voyage out, except as might be permitted by Green, who had chartered and loaded the whole vessel, and that Perkins' claim on Green for freight was not due at the time, little doubt is entertained, that Hill's right to adjust it with Green is in conformity with the express contract made between them, is prior in time to any right by Perkins, and was not intended to be changed, nor was actually changed by a bill of lading, like this in form, signed by Perkins to Hill, and is strongly fortified by the memorandum, conferring on the libellant some right to collect freights homeward, but none arising on the outward voyage. Judgment below affirmed.