H. S. HAGAR AND OTHERS, RESPONDENTS, v. JOHN H. CLARK AND SAMUEL H. SEAMAN, APPELLANTS.

*Charter-party — when construed as being a contract of affreightment, and when as one for the hire of a vessel.*

The plaintiffs, the owners of a steamer, entered into an agreement with the defendants, to the following effect: The plaintiffs freighting and chartering to the defendants all the vessel except the necessary room for crew, provisions, sails and cables, for a voyage from New York to New Orleans and return, the vessel to be tight and fitted for the voyage, and to receive goods and mer-

chandise from defendants and no one else; the defendants to furnish such cargo as they saw proper and to pay for the use of the vessel $7,000 and all expenses; the time allowed for lading was specified. The cargo was to be received and delivered within reach of the vessel's tackles. In case of an accident to the machinery, whereby the vessel was detained, the plaintiffs were to pay the expenses of repairs, victualing and manning.

*Held,* that the contract was not a contract of affreightment, but that by it the defendants hired the vessel and had entire control of her during the voyage.

That the exception of the necessary room for the crew, provisions, sails and cables being made, not for the benefit of the plaintiffs, but for such uses as were required in the navigation of the vessel, was not inconsistent with such construction nor was the provision that the cargo should be delivered within reach of the vessel's tackle (seemingly inconsistent with defendants' exclusive control) sufficiently decisive to change it.

During the voyage the boiler gave way through the negligence of the engineer in allowing the water in it to get too low. This action was brought to recover a portion of the $7,000 stipulated to be paid, and damages for the demurrage caused by the failure of the boiler. *Held,* that, as under the proper construction of the contract, the engineer was the defendants' servant they were responsible for the delay caused by his negligence.

APPEAL from a judgment in favor of the plaintiffs, entered upon the report of a referee.

This action was brought to recover damages alleged to have been caused by a breach of the following agreement:

"This charter-party, made and concluded upon in the city of New York the 27th day of July, in the year of our Lord eighteen hundred and sixty-five, between J. P. Manton, agent for owners of the steamer H. S. Hagar of New York, of the burden of 1,113 tons or thereabouts, register measurement, now lying in the harbor of New York, of the first part, and Messrs. H. B. Cromwell & Co., merchants of New York, of the second part, witnesseth: That the said party of the first part agrees on the freighting and chartering of the whole of the said vessel (with the exception of the necessary room for the crew and stowage of provisions, sails and cables) or sufficient room for the cargo hereinafter mentioned, unto the said party of the second part, for a voyage from New York to New Orleans and back to New York, on the terms following: The said vessel shall be tight, staunch, strong and in every way fitted for such a voyage, and receive on board during the aforesaid voyage the merchandise hereinafter mentioned, and no goods or merchandise shall be laden on board, otherwise than from the said party of

the second part or their agent. The said party of the second part doth engage to provide and furnish to the said vessel such cargo of lawful merchandise as they may see proper, and to pay said party of the first part or agent, for the use of said vessel during the voyage aforesaid, seven thousand dollars for the voyage and all expenses, including stevedores' bills, officers' and crew's wages, stores and supplies, coal and every thing requisite for the voyage, also levee dues, wharfages, health bills, port charges, pilotages, and every thing pertaining to the voyage, including government tax, leaving a net sum of seven thousand dollars to the owners, payable as follows: Three thousand dollars on discharge of the cargo at New Orleans and the balance, four thousand dollars, on discharge of the cargo at New York. It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the captain reports himself ready to receive or discharge cargo. Vessel to be ready to receive cargo on the thirty-first July, and to sail on the second August, to sail from New Orleans within seven running days from arrival there, and to be discharged within three running days from arrival in New York, exclusive of Sunday, and that for each and every day's detention by default of said party of second part or agent two hundred and fifty dollars per day, day by day, shall be paid by said party of second part or agent to said party of the first part or agent. The cargo or cargoes to be received and delivered within reach of vessel's tackles at ports of loading and discharging. In case of accident to machinery, whereby vessel is detained for repairs, the actual expenses, including victualing and manning thereby incurred, are to be paid by owners. To the true and faithful performance of all and every of the foregoing agreement, we, the said parties, do hereby bind ourselves, our heirs, executors, administrators and assigns, each to the other, in the penal sum of seven thousand dollars.

"In witness whereof we hereunto set our hands the day and year first above written.

      "(Signed)       JOS. P. MANTON,

                    "*Agent Steamship H. S. Hagar.*

           "H. P. CROMWELL & CO."

"Sealed in the }
   presence of   }

The plaintiff sought to recover the $4,000 stipulated to be paid upon the discharge of the cargo at New York, and damages for delay in returning the vessel.

*John E. Parsons,* for the appellants.

*John T. Washburn,* for the respondents.

DANIELS, J. :

The judgment appealed from was for the amount held to be due upon a charter-party, made on the twenty-seventh day of July, 1865, for a voyage of the steamer Hagar from New York to New Orleans and back. The defendants resisted the recovery because of the failure of the boiler of the steamer soon after she entered upon the voyage, by reason of which she was delayed in reaching New Orleans for so long a period of time as to render them unable to obtain for her a remunerative return cargo. The foundation of the claim was that the charter was merely a contract for affreightment, and that the responsibility for the delay was legally upon the plaintiffs as the owners of the steamer. But the referee held otherwise and that the steamer was hired to and navigated by the defendants, and for that reason the loss occasioned by the delay must be borne by themselves. This delay and consequent loss arose out of what the learned referee in his report held to be an accident ; but in the further findings added upon the settlement of the case, it was stated : "That the cause of the giving way of the boiler of the Hagar, was the negligence of the engineer on watch at the time in allowing the water in the boiler to get too low." It has been urged that this was inconsistent with the statement made in the report attributing the injury to an accident. But it is not very material to inquire whether this criticism is well founded or not, for if the fact was that the boiler gave way because of the negligence of the engineer on watch at the time, the responsibility for the delay created by that circumstance would still be upon the defendants if he was their servant in their employ, as he was, if they possessed and navigated the steamer. This conclusion, as it was last stated, was supported by the evidence, and for that reason it is not necessary to consider the effect of the presumption arising as to the

unseaworthy character of a vessel disabled, without any other apparent cause, within a few hours after she may have commenced her voyage. The steamer was a new one, having been in use less than one month before she was chartered to the defendants, and the evidence was sufficient to show that she was then tight, staunch, and strong, and in every way fitted for her voyage, as the charter required her to be when that instrument was executed. And the referee, upon this evidence found that to be her condition. The important point, therefore, in the case is the nature of the agreement which was entered into for her use. It contained no terms of demise, such as are often used in charters letting the vessel, and her control to the charterer. But that omission is not decisive of the case, for without such terms there may be a complete letting of a vessel, and the transfer of her exclusive possession to the charterer, where that still appears to be the intention of the parties as it may be gathered from the terms of their agreement. (*Saville* v. *Campion*, 2 Barn. & Ald., 503.)

But it has been strenuously maintained that no such disposition was made of this steamer, because of the existence of a clause in the charter excepting from the right to use the whole of her for freighting purposes, "the necessary room for the crew and storage of provisions, sails and cables." That exception, however, was not made in a form reserving that room to or for the plaintiffs. But it was simply for such uses as were required in the ordinary and proper navigation of the steamer, and for the benefit solely of the persons exercising that control over her during the prosecution of the contemplated voyage. There was no serious inconsistency in its existence with the fact that the management and possession of the steamer was at the same time designed to be given to the defendants. And it has been so held in other cases that are regarded as sound authority upon this subject. (*Trinity House* v. *Clark*, 4 Man. & S., 288; *Sherman* v. *Fream*, 30 Barb., 478; *Christie* v. *Lewis*, 2 Brod. & B., 410.)

This is a circumstance from which, with others when they exist, it may be inferred that the navigation and control of the vessel have been retained by her general owners, but it has in no instance been alone considered as conclusive. In the case of *Clarkson* v. *Edes* (4 Cow., 470), which has been regarded as an important authority in

cases of this description, the vessel was, by the terms of the charter to be kept tight, strong, well manned, victualed, and appareled by the owners during the voyage. And it was for this reason combined with the reservation of sufficient room for the promotion of those purposes, that the agreement was held to be only a contract for affreightment. The same construction, for similar reasons, was given to the charters made in the cases of *Marcardier* v. *Chesapeake Ins. Co.* (8 Cranch, 39); *Donahoe* v. *Kettell* (1 Clifford, 135); and *Leary* v. *United States* (14 Wallace, 607). In each instance the general owners stipulated to keep the vessels chartered in proper sailing condition, and also for a suitable reservation of room for their own convenience and that of their crew during the voyage. The controlling stipulation was considered to be that which bound them to keep the ship in proper sailing order, and competent for the transaction of the business to be done by her. (*Fenton* v. *Dublin, etc., Co.*, 8 Ad. & E., 835.) And the reservation of the room was merely subsidiary, or incidental to the performance of that obligation.

In the present instance no such duty was, in any form, imposed upon the plaintiffs as the general owners of the steamer. They merely agreed that she should be tight, staunch, and strong, and in every way fitted for such a voyage. And that part of their agreement they performed by delivering her in that condition to the defendant. They did not bind themselves to keep her in that condition, but merely that she should be so at the time when they surrendered her for the performance of the terms of the charter. What they agreed in terms to do, was to charter the whole of the vessel, or sufficient room, subject only to the exception already stated, for the cargo afterwards mentioned. And that was such a cargo of lawful merchandise as the charterers might deem it proper to laden her with. In that respect the charter differed from the one which was before the court in the case of *Hooe* v. *Groverman* (1 Cranch, 124), where the charterers simply had the use of the whole tonnage of the vessel; while here they had the whole of the steamer for whatever lawful cargo they chose to lade her with, except that required for the convenience of the crew and the stowage of provisions, sails and cables, and even that was also necessarily enjoyed by them for those purposes. Besides, they were to, and in fact did pay all the expenses beyond the sum of $7,000, which was the stipulated

amount of the charter, "including stevedores' bills, officers' and crew's wages, stores and supplies, coal, and every thing requisite for the voyage; also levee dues, wharfages, health bills, port charges, pilotages, and every thing pertaining to, the voyage, including government tax, for the use of said vessel during the voyage." And the only obligation to which the charter in this connection in terms subjected the plaintiffs, was that of paying the expenses of repairs rendered necessary by accidents to the machinery of the steamer, and which she should be actually detained in obtaining; and those of victualing the crew for the same time. All other expenses were to be borne by, and were made debts of, the defendants, who could place upon her such lawful cargo as they saw proper to the utmost extent of her carrying capacity. And no freight whatever was reserved or payable to the plaintiffs for it beyond the $7,000 which, aside from the allowance for demurrage, was the stipulated price of the charter. These circumstances are exceedingly significant, and much more consonant with a complete hiring and control of the steamer, than with a mere contract of affreightment. No good reason can be perceived for binding the defendants to pay all the navigating and harbor expenses, unless they were intended to have the possession, management and direction of the vessel. And then, in making such payments they would simply discharge their own obligations, created solely for the transaction of their business, the extent of which must have been entirely unknown when the charter was executed.

The case cannot be affirmed to be a clear one against the defendants, but enough appears to render it reasonably certain that it was the intention of the parties in making the charter that they should have the possession, control and direction of the steamer for the time mentioned in it. The governing point in the determination of this class of cases has been considered to be whether there has been an entire letting, or parting with the possession of the ship, so that during the voyage, the absolute owner has surrendered his control over her. If such possession has been agreed upon (and that seems to have been done in this instance), then the charterer receiving her under the agreement must be considered her owner for the stipulated employment. (*Christie* v. *Lewis* and *Leary* v. *United States supra; Gracie* v. *Palmer*, 8 Wheaton. 605.)

It has been urged, that as the steamer had her officers employed, and on board at the time of the charter, that this circumstance of itself showed that the plaintiffs were to supply the crew. But the case last referred to holds that to be an unimportant fact. For the steamer could as well be transferred to the possession of the defendants with a complete crew already on board, as though its members were to be afterwards wholly employed by the charterers. (Id., 633.)

The evidence very directly tended to show, and the referee found from it, that in point of fact, the possession of the steamer with her officers on board was turned over to, and accepted by, the defendants. The agent acting for them in the procurement and execution of the charter, distinctly testified to the existence of those facts. And the residue of the crew were either employed by the defendants or the officers on board the steamer, acting for them after that time. She sailed under their direction, and received such merchandise for transportation as they could obtain for her. And they were in no respect interfered with by the plaintiffs. Their acts under the charter were consistent with the existence of no other intention than that they were to, as they did, have possession of the steamer during its continuance. And that, in a case of doubtful construction, is a circumstance of importance in ascertaining and determining the design governing the parties in the making of their agreement. (*Reed* v. *Proprietors of Locks, etc.*, 8 How. [U. S.], 274.)

The clause in the charter that the cargoes to be received and delivered should be placed within reach of the steamer's tackles, at the ports of loading and discharging, must be conceded to be in conflict with the construction now given to that instrument. For there would seem to be no reason for the general owner's solicitude on that subject, if the steamer was to be delivered over to the exclusive control and possession of the defendants. But the other stipulations at variance with this provision, and the unequivocal acts of the parties themselves, indicating their understanding of the agreement they had made to be that of a letting of the vessel, are too decisive in their effect to permit this to control the disposition which should be made of the case. There was but one contingency upon which responsibility or expense was placed on the plaintiffs, and that was only for accidents to the steamer's machinery. In all other respects the burthens, as well as the

risks and profits of the voyage were placed upon, and secured to the defendants. The engineer through whose negligence the boiler was strained and injured, was, therefore, both by the theory of the charter, and as a matter of fact, their servant and in their employment. And for that reason they, and not the plaintiffs, were responsible for the detention and consequent loss, resulting from his negligent act. (*Donahoe* v. *Kettell*, 1 Clifford, 135, 138.) If, as the referee considered it, that was an accident, then the plaintiffs were relieved from all liability on account of it beyond that for expenses of repairs and supporting the crew, by the express terms of the charter. But if he was in error in that conclusion the error did not affect the result in the case, for the injury was produced by the negligent act of the defendant's servant.

It has also been urged that the recovery of $1,250 allowed for detention beyond the time mentioned in the charter was unwarranted. But there was evidence in the case from which it could be very well found, that such detention was caused solely by the default of the defendants' agent at New Orleans. The referee relied upon that evidence and found the fact accordingly, and there is nothing in the case on which it can be held that he acted erroneously. Neither did he improperly decline to find other facts supported by the evidence and material to the disposition of the case. The judgment seems to have been rightfully directed, and it should, therefore, be affirmed.

DAVIS, P. J., and BRADY, J., concurred.

Judgment affirmed.