THE BOMBAY.

WIGTON et al. v. THE BOMBAY.

(*District Court, E. D. Louisiana.* December 11, 1888.)[1]

MARITIME LIENS—SUPPLIES—CHARTER-PARTY.
 By a charter-party the owners "agreed to let" and the charterers "agreed to hire for the term," etc. The owners were to man the vessel, pay for all provisions, wages, consular, shipping, and discharging fees of officers and crew, insurance of vessel, engine-room stores, and maintain it in an efficient state during the service. The charterers were to provide and pay for all coals, port charges, pilotage, etc. The charter-party further provided that "the captain, though appointed by the owners, should be under the orders and directions of the charterers as regards employment, agency, and other matters," and that "when the vessel is delivered to the owners' agent—that is, after the termination of the voyage—any difference," etc. There was a provision permitting the appointment of a supercargo. *Held,* that the charterers had the control, management, and possession of the vessel, and that the vessel was liable for coal necessary to enable it to prosecute the voyage, furnished to it in a foreign port by parties not affected with notice of the terms of the charter-party.

In Admiralty.

Libel by R. B. Wigton & Sons for coal furnished to the charterers of the steam-ship Bombay.

*Bayne, Denegre & Bayne,* for libelants.

*James McConnell,* for respondent.

BILLINGS, J. The facts necessary to be considered in this case are that the Bombay is an English steamer; that she was in Philadelphia, and

---

[1] Publication delayed pending motion for rehearing.

needed coal to prosecute her voyage to New Orleans, and it was furnished her. The vessel was under a charter, and it was during the time that the charter-party was in force that these coals were furnished. The coals were not furnished on the order of the master, though he states they were needed to enable her to prosecute her voyage to New Orleans. The coal was furnished by the libelants' firm, under an arrangement made between LaTassa & Co., the charterers, of New York, and them, by which they were to supply with coal, at Philadelphia, all steam-ships requiring fuel at this port, of which LaTassa & Co. controlled the coaling. The libelants, in furnishing the coal, did not know anything about the financial standing of LaTassa & Co., and made no inquiries, because they considered the steam-ship liable for the coal. It is manifest from these facts that neither the master nor the owners gave any order for the coal that was furnished to the vessel; that the question whether the vessel is subjected to a lien for the supply of these coals must depend entirely upon whether the charter-party made the charterers owners *pro hac vice*. All the authorities are agreed that "when the general owner allows the charterer to have the control, management, and possession of the vessel, he becomes the owner for the voyage. A general owner, under such circumstances, must be deemed to consent that the vessel shall be answerable for necessary repairs and supplies to enable her to pursue her voyage, and that the special owner may bind the interest of the general owner in the vessel in this behalf." The question, then, simply is whether by the terms of this charter-party the charterers were to have, and did have, the control, management, and possession of the vessel. The vessel was chartered for one voyage between the Mediterranean and the United States, the United Kingdom, or the continent, as the charterers or their agents shall direct. The owners were to man the vessel, pay for all provisions, wages, consular, shipping, and discharging fees of the captain, officers, engineers, firemen, and the crew, the insurance of the vessel, all engine-room stores, and maintain her in a thorough and efficient state, in hull and machinery, for and during the service. The charterers were to provide and pay for all coals, port charges, pilotage, etc., except as above stated. The charter-party further provided that "the captain, though appointed by the owners, should be under the orders and directions of the charterers, as regards employment, agency, or other matters;" and the charterers agreed to indemnify the owners from all consequences or liability with reference to signing bills of lading. The decisive stipulation in this charter-party is the last,—that the captain, though appointed by the owners, should be under the orders and directions of the charterers as regards employment, agency, or other arrangements. This, in *The India*, 14 Fed. Rep. 476, and 16 Fed. Rep. 262,—the same case,—was thought by Judges BLATCHFORD and WALLACE to determine that the owners had made the charterer the owner *pro hac vice*. See, also, Judge NELSON's opinion in *The City of New York*, 3 Blatchf. 187, and *The Freeman*, 18 How. 182–190. In *Leary v. U. S.*, 14 Wall. 607, it is said "that the retention by the general owner of such command, possession, and control is incompatible with the existence at the same

time of such special ownership in the charterer." Page 611. But in this case the matter as to the party in whom command, possession and control should be vested is not left to inference, but is settled by the clause in the charter-party last quoted. If these authorities are correct, the only defense that could have been offered under such a charter-party would have been that the libelants had been put upon their inquiry as to the authority given under the charter-party, but no such defense is here established. Let there be judgment for libelants.

### ON REHEARING.

#### (March 19, 1889.)

BILLINGS, J. Since the opinion in this case was announced the charter-party of *The India*, 14 Fed. Rep. 476, 16 Fed. Rep. 262, referred to therein, has been obtained, and certain authorities have been cited in the brief of respondent for a rehearing. In the opinion rendered in the case it was stated that the question was whether the charterers were to have, and did have, control, management, and possession of the vessel, and a line of cases was referred to which maintain that by some similar charter-parties the possession and control were vested in the charterers. This line of cases must control me, unless this case is distinguishable from *The India*. An effort is made by learned proctor for respondent to show that a distinction exists, and, first, he points to the provision in the charter-party that the charterers shall have permission to appoint a supercargo, who shall accompany the steamer, and see that the voyages are prosecuted with the utmost dispatch. In connection with this clause the case of *Saville* v. *Campion*, 2 Barn. & Ald. 503, is cited. In that case the charter-party did not contain the words "let to freight," but the whole "instrument," as the court terms it, contains matter of contract and covenant only. The agreement was to take on board the goods of the freighter, and sail to Madeira, etc. The owner further agreed that such passengers as might be required by the freighter should be conveyed in the ship; that all the cabins except one should be for the benefit and at the disposal of the freighter. There is also a clause providing for a supercargo to be sent out by the charterers. Since in that case there was no letting,—only a contract to carry freight,— the court held that the specification of the right of the charterers to appoint a supercargo was another evidence of the intent not to let. But the court did not hold that in all cases the specification in the charter-party of the right of the charterers to appoint a supercargo would show no possession or control of the vessel in them, for rights are specified or reserved in instruments as often to give emphasis to its general purport —as is the case here—as to make an exception to the general effect of instruments,—as was the case there. In all of the cases which are grouped together in the opinion of SAVAGE, C. J., in *Clarkson* v. *Edes*, 4 Cow. 478, great weight is attached to the phraseology of the charter-party as to whether the vessel itself was hired, or whether the charter-party was merely a contract to carry freight. In the case before the

court the said owners "agreed to let," and the said charterers "agreed to hire, for the term of," etc.; and the charter-party further provided that "when the vessel is delivered to the owners' agent—that is, after the termination of the voyage—any difference," etc. Therefore the general phraseology of the charter-party is that of an instrument which was intended by the parties thereto to grant and "to freight let." So far as relates to the provisions of the charter-party that the charterers shall have permission to appoint a supercargo, who shall accompany the vessel, and see that the voyages are prosecuted with the utmost dispatch, it does not control the general effect of the charter-party, but is in aid of it. Much less does it do away with the particular provision that the captain, although appointed by the owners, shall be under the orders and directions of the charterers as regards employment, agency, or other arrangements. Now, in *Clarkson* v. *Edes*, 4 Cow. 477, although the language was that the vessel was let, the second and third clauses were that the party of the second part, the charterer, may load and discharge from on board the schooner such cargo in either of the ports or places as by the party of the first part (the owners) shall be ordered. The court held that those clauses were inconsistent with the possession, being in the charterer, and the correctness of this conclusion cannot be doubted; but the agreement in that case had not the features the present charter has. After a careful review of the cases, and a consideration of all the arguments urged, I am still of the opinion that in the present case it is my duty to follow the authorities referred to in my former opinion, and therefore the motion for a rehearing is refused.